[No. A042270. First Dist., Div. One. Dec. 17, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFF ST. JOSEPH, Defendent and Appellant.

[Opinion certified for partial publication.*]

---

*Pursuant to California Rules of Court, rules 976 and 976.1, this opinion is certified for publication. The portion to be published follows.

**COUNSEL**

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Morris Beatus and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEIN, J.**—Cliff St. Joseph appeals from his convictions of the first degree murder of John Doe No. 60 and sodomy and false imprisonment of Ricky Hunter. The court sentenced appellant to state prison for a term of 25 years to life for the murder. This sentence is to be served consecutively to the aggravated term of nine years for the sodomy. The three-year sentence for false imprisonment is stayed pursuant to Penal Code section 654.

## FACTS

On June 15, 1985, a body was discovered in an industrial area of San Francisco. An autopsy revealed that the victim's death had been caused by multiple stab wounds, which had been inflicted while the victim was nude. There were numerous other scars and abrasions on the body including a five-pointed star, which had been carved into the victim's chest and upper abdomen.

On June 24, in response to a call from appellant's apartment, the police arrested four people for disturbing the peace. One of the people arrested, Mr. Hunter, had been taken to the apartment two days before by appellant. At the apartment he was restrained and repeatedly assaulted by appellant, Mr. Bork, and Mr. Spela. During this time appellant, Bork and Spela were discussing Satanic worship and "sacrificing" Hunter.

Mr. Bork, who had numerous prior felonies, was granted immunity from prosecution for offenses against Mr. Hunter and for being an accessory to murder. He was an escapee from Canada who, shortly after he arrived in San Francisco, had been befriended by appellant. Bork was present in the apartment when the murder victim arrived. He left the apartment after he heard screaming from the bedroom and saw appellant slashing the victim's chest. When he returned to the apartment later that night, the victim was lying on the bed bleeding. Bork helped appellant dispose of the body in an industrial area of the city.

A search of appellant's apartment found numerous bloodstains of the same blood type as the murder victim.

Appellant described the killing to an inmate, McCray, who shared a cell with him.

## ANALYSIS *

. . . . . . . . . . . . . . . . . . . . . . . .

2. *The Evidence Was Sufficient to Support a Conviction of First Degree Murder Perpetrated by Torture*

■ Appellant contends that the court should not have instructed the jury on the theory of first degree murder perpetrated by torture because the evidence was insufficient to support a conviction on the theory of torture murder. The premise of his argument is that there was insufficient evidence to support the inference that either the pentagram carved in the victim's chest, or the genital mutilation, occurred while the victim was alive. Once these injuries are excluded, appellant contends the evidence was insufficient to support an inference that he intended to inflict pain and suffering on the victim.

■ One of the key elements of murder perpetrated by torture is that "[t]he perpetrator committed the murder with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose." (CALJIC No. 8.24 (1989 rev.).) "It is not the amount of pain inflicted which distinguishes a torturer from another murderer, as most killings involve significant pain. (*People* v. *Tubby* [1949] 34 Cal.2d 72, 77 [207 P.2d 51].) Rather, it is the state of mind of the torturer—the cold-blooded intent to inflict pain for personal gain or satisfaction—which society condemns." (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].)

Although the severity of the wounds inflicted on the victim is a factor to consider in determining whether the perpetrator had this intent, the courts have cautioned against exclusive reliance on the condition of the victim's body. (See, also, *People* v. *Morales* (1989) 48 Cal.3d 527, 559 [257 Cal.Rptr. 64, 770 P.2d 244].) Thus, the courts have found the evidence insufficient to support a torture murder conviction, despite the gruesome condition of the victim's body, where the prosecution's evidence only supported the conclusion that the wounds were inflicted in anger, frustration, or a misguided attempt to discipline a child. (See, e.g., *People* v. *Steger, supra*, 16 Cal.3d at p. 543; *People* v. *Walkey* (1986) 177 Cal.App.3d 268, 276 [223 Cal.Rptr. 132]; *People* v. *Anderson* (1965) 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43].) ■ By analogy to these cases, appellant attempts to characterize

---

\* See footnote *ante,* page 289.

the killing of John Doe No. 60 as merely an "explosion of violence" based on his contention that, whatever other wounds may have been inflicted, the cause of death was a series of stab wounds to the neck.

There was substantial evidence that appellant committed a sadistic, ritualistic, human sacrifice consisting of whipping with a chain, slashing the victim's lips, dripping wax into the victim's eyes, burning and carving the victim's flesh with a knife, multiple stabbings, tying the limbs with guitar wire, and genital mutilation. The inference of subjective intent to inflict pain for sadistic purposes may be drawn from the beatings, Bork's testimony that appellant masturbated over the victim's body and that, when the victim briefly recovered, appellant became "ecstatic" that "he rose to die again." The inference is further supported by McCray's testimony that appellant said the victim was brought to appellant's apartment for sadomasochistic purposes; the nature of the wounds; and the coroner's testimony that many of the wounds were consistent with sadomasochistic practices.

Appellant, nonetheless, argues that this evidence was insufficient to support an instruction on first degree murder perpetrated by torture because most of the more egregious, painful injuries were inflicted after the victim died. In support of his conclusion that the evidence was insufficient, appellant first contends that this court must disregard Bork's testimony regarding the sequence of infliction of injuries as "inherently improbable" (see, e.g., *People* v. *Thornton* [(1974)] 11 Cal.3d [738] at p. 754 [114 Cal.Rptr. 467, 523 P.2d 267]) because it is "so incompatible" with the testimony of the coroner regarding the sequence of infliction of injuries.[1] Even if appellant's characterization of the coroner's testimony were correct, the apparent conflict between it and Bork's testimony amounts to no more than a conflict in the evidence. ■ " 'Conflicts and even testimony which is subject to justifiable suspicion do not' " constitute inherent improbability. (*Id*. at p. 754, disapproved on other grounds in People v. *Flannel* [(1979)] 25 Cal.3d [668] at p. 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]; accord *People* v. *Barnes* (1986) 42 Cal.3d 284, 303-304, 306 [228 Cal.Rptr. 228, 721 P.2d 110].)

## 3. *The Torture Murder Instructions Were Correct*

The instructions given on torture murder were the 1987 version of CALJIC No. 8.24. ■ Appellant argues that these instructions were incorrect because they did not inform the jury that there "must be a causal

---

[1] Appellant further asserts that Spela's testimony that appellant told him that the genital mutilation occurred while the victim was still alive must also be disregarded as inherently improbable. Appellant, however, offers no reason why Spela's testimony should be regarded as inherently improbable.

relationship between the torturous act and the victim's death." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 267 [221 Cal.Rptr. 794, 710 P.2d 861].) He contends that the jury therefore could have concluded that there was a murder *caused by* the three stab wounds, which was *followed by* the "torturous acts," i.e., the carving of the pentagonal star and the genital mutilation committed on the body of the already dead victim.

■ Our Supreme Court has recently reiterated that its definition of torture murder set forth in *People* v. *Wiley* (1976) 18 Cal.3d 162 [133 Cal.Rptr. 135, 554 P.2d 881] is correct when coupled with language specifying that the torturous intent must be "willful, deliberate and premeditated," and instructions based on the *Wiley* definition are correct. (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1101 [259 Cal.Rptr. 630, 774 P.2d 659].) In *Wiley* the court defined the elements of murder perpetrated by torture as follows: " '(1) the act or acts which caused the death must involve a high degree of probability of death, and (2) the defendant must commit such act or acts with the intent to cause cruel pain and suffering for the purpose of revenge, extortion, persuasion or for any other sadistic purpose.' " (*Wiley, supra*, 18 Cal.3d at p. 168.) The qualification that intent must be "willful, deliberate and premeditated" was added by *People* v. *Steger, supra*, 16 Cal.3d at page 546.

■ Although the courts have stated that there must be a causal relationship between the torturous acts and the murder, none of the various definitions of the *elements* of torture murder advanced by our Supreme Court have ever included explicit language to this effect. Instead, the necessity of finding a causal relationship has only been implicit in the definition of the first element of torture murder, i.e., that "the act or acts *which caused the death* must involve a high degree of probability of death." Thus, we are not persuaded by appellant's argument that it was error not to include explicit language, similar to the language added to the 1989 version of CALJIC No. 8.24.

In any event, the specific harm that appellant contends flows from the failure to include this language regarding causation in the instruction, i.e., that the jury could find torture murder based on tortuous acts committed after the victim died, is obviated by the inclusion of the following language in the 1987 version of CALJIC No. 8.24 given in this case: "The perpetrator committed the murder with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain *upon a living human being*. . . ." Thus, in order to find appellant guilty of torture murder under these instructions, the jury would have had to find that the torturous acts were committed while the victim was alive. ■ "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are

reasonably susceptible to such interpretation." (*People* v. *Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258 [222 Cal.Rptr. 686].) We therefore conclude that the instructions as given adequately informed the jury that the torturous acts causing the death must have been committed while the victim was alive.

We also note that, even if the instructions were erroneous, appellant's claim of prejudice depends on the premise that, based on the evidence, the jury could reasonably have found that the death was caused by three stab wounds, not inflicted with torturous intent, and that the torture occurred after the victim died. This argument overlooks the substantial, *undisputed* evidence of numerous injuries inflicted upon the victim while he was alive. It is improbable that based on this course of conduct that a reasonable jury would have found that the only "torturous acts" were the carving of the pentagonal star and the genital mutilation, and that these acts were committed after the victim died.

Appellant also appears to argue that the injuries that undisputedly occurred while the victim was alive could not be the basis for a finding of torture murder because they were not identified by the coroner as the ultimately fatal injuries or "cause of death." This type of attempt to parse the injuries inflicted during a course of conduct into a series of nonfatal injuries has been rejected. (See *People* v. *Hindmarsh* (1986) 185 Cal.App.3d 334, 349 [229 Cal.Rptr. 640]; see also *People* v. *Talamantez* (1985) 169 Cal.App.3d 443, 455-466 [215 Cal.Rptr. 542].)

### 4. *Bork's Testimony Under a Grant of Immunity Did Not Deprive Appellant of His Due Process Right to a Fair Trial*

 Appellant next argues that permitting Bork to testify under a grant of immunity for accessory after the fact for the murder of John Doe No. 60 and for any act related to the charges of false imprisonment and sodomy of Hunter deprived appellant of a fair trial.

Before Bork testified the court determined that, if called as a witness, he would invoke his Fifth Amendment privilege against self-incrimination in response to any questions regarding events occurring at appellant's apartment in 1985. The court upheld Bork's invocation of the privilege. The prosecutor then requested that the court order Bork to testify under a grant of immunity as to the sodomy and false imprisonment of Ricky Hunter and for Penal Code section 32, accessory after the fact to the murder of John Doe No. 60. This grant of immunity did not extend to the murder. Bork, who was represented by counsel, expressly waived his privilege against self-

incrimination with respect to questions pertaining to the murder of John Doe No. 60.

■ ■ ■ ■ ■ Appellant contends that Penal Code section 1324 requires that a witness be given complete transactional immunity with respect to "any offense which is implicated by the compelled testimony."[2] (*People* v. *Campbell* (1982) 137 Cal.App.3d 867, 874 [187 Cal.Rptr. 340].)

Nothing prevents the prosecution from reaching a consensual agreement with the witness to testify under a narrower grant of immunity than he might otherwise be entitled to under Penal Code section 1324. Thus, for example, in *People* v. *Superior Court* (*Perry*) (1989) 213 Cal.App.3d 536 [261 Cal.Rptr. 665], the court specifically held that, "while the district attorney is entitled to *offer* immunity outside [Penal Code] section 1324, such offer is not enforceable until it has been accepted or relied upon." (*Id.* at p. 540, original italics.) Similarly, in *People* v. *Label, supra,* 43 Cal.App.3d at p. 774, the court held that "We see no impropriety in limiting the immunity to designated crimes committed within a specified period of time. It follows that the immunized witness may not be *compelled* to testify as to possible criminal involvement at other times. As to such involvement, any witness stands in the same position as any other witness . . ." and is free to invoke the privilege against self-incrimination. (*Id.* at p. 774, our italics.) It also follows that the witness is free to *waive* the privilege against self-incrimination as did Bork in this case.[3]

Appellant's argument reduces to the claim that, despite the agreement between Bork and the prosecution regarding the scope of immunity that would be granted, appellant can, in effect, demand that the district attorney grant Bork immunity as to *all* of the potential charges, including the murder of John Doe No. 60. Appellant is proposing that the *defendant* should

---

[2] Even when a witness testifies under compulsion pursuant to Penal Code section 1324, the scope of immunity is limited by the scope of inquiry. Thus, the prosecutor may limit the scope of immunity by narrowly defining the scope of testimony the witness is under compulsion to give. (See, e.g., *People* v. *Campbell, supra,* 137 Cal.App.3d at p. 878, fn. 10.) Moreover, if the section 1324 order does narrowly define the scope of testimony which is compelled, then the witness is free to invoke the privilege against self-incrimination as to other matters and has no immunity regarding offenses implicated by testimony voluntarily given that is outside the scope of the order. (See, e.g., *People* v. *Label* (1974) 43 Cal.App.3d 766, 774 [119 Cal.Rptr. 522].)

[3] Bork voluntarily waived his privilege against self-incrimination with respect to questions relating to the murder of John Doe No. 60. It is axiomatic that a witness may waive the privilege against self-incrimination. (*Minnesota* v. *Murphy* (1984) 465 U.S. 420, 427-428 [79 L.Ed.2d 409, 419, 104 S.Ct. 1136].) Once Bork waived the privilege of self-incrimination, he was not even entitled to immunity under Penal Code section 1324 because he did not assert the privilege and therefore was not testifying under compulsion as to questions about the murder.

have the right to compel the prosecution to grant immunity to a witness. This proposition has been consistently rejected. (*In re Weber* (1974) 11 Cal.3d 703, 720 [114 Cal.Rptr. 429, 523 P.2d 229]; *People v. Wisely* (1990) 224 Cal.App.3d 939, 943-944 [274 Cal.Rptr. 291]; *People v. Sutter* (1982) 134 Cal.App.3d 806, 812-816 [184 Cal.Rptr. 829]; *People v. Label, supra,* 43 Cal.App.3d at p. 774.)

Appellant, drawing an analogy to *People v. Medina* (1974) 41 Cal.App.3d 438 [116 Cal.Rptr. 133], argues that because Bork was granted immunity only for his admitted conduct as an accessory, he would feel compelled to continue to implicate appellant as the perpetrator and deny involvement in the murder. If he did otherwise, he could face prosecution for murder. Appellant overlooks a key fact in this scenario: Assuming arguendo that it may have been Bork, rather than appellant, who participated in the murder of John Doe No. 60, the source of the "compulsion" Bork might have felt to testify in accordance with his pretrial statements was the natural impulse to exculpate himself. This "compulsion" *preexisted* and was independent of the grant of immunity. ■ As subsequent decisions have clarified, *Medina* found a due process violation only where *the prosecution or the court* places the accomplice witness under a strong compulsion to testify in accordance with a " 'predetermined formulation or rendered acceptable only if it produces a given result, that is to say, a conviction.' " (*People v. Garrison* (1989) 47 Cal.3d 746, 769 [254 Cal.Rptr. 257, 765 P.2d 419].)[4] ■ In this case Bork was not granted immunity *under any condition* for the murder of John Doe No. 60. Thus, with respect to his testimony regarding the murder, he was in no different position when he testified at trial than he was when he gave his statements to the police.

Taken to its logical extreme, appellant's due process argument would require the prosecution to grant complete immunity to any accomplice witness testifying for the prosecution. Otherwise, he reasons, the accomplice will simply testify in a manner that exculpates himself.

■ We are unpersuaded that it is necessary to create such an obligation in order to protect appellant's right to a fair trial. There is no question that the testimony of an accomplice witness should be viewed with great suspicion, and the court routinely instructs the jury to view such testimony

---

[4] The Supreme Court has read *People v. Medina, supra,* 41 Cal.App.3d 438, quite narrowly and has consistently rejected criminal defendants' claims of due process violations where the only condition placed on the grant of immunity or the terms of a plea bargain is that the witness must testify truthfully. (See, e.g., *People v. Johnson* (1989) 47 Cal.3d 1194, 1228-1229 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People v. Allen* (1986) 42 Cal.3d 1222, 1252 [232 Cal.Rptr. 849, 729 P.2d 115], cert. den. 484 U.S. 872 [98 L.Ed.2d 153, 108 S.Ct. 202]; *People v. Fields* (1983) 35 Cal.3d 329, 360-361 [197 Cal.Rptr. 803, 673 P.2d 680].)

with distrust. The defendant is also free to explore fully the motivation for such a witness to lie. The defendant is also free to expose the scope of immunity granted to the witness and to explore the witness's expectations of favorable treatment even where no immunity has been granted or no deals have been made. ▮ Appellant took full advantage of his right to impeach Bork on all of these bases. We find that appellant's due process rights were fully protected by the exercise of his right vigorously to cross-examine and impeach Bork.

. . . . . . . . . . . . . . . . . . . .*

## CONCLUSION

The judgment is affirmed.

Racanelli, P. J., and Newsom, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 13, 1991.

---

*See footnote *ante*, page 289.