[No. A048465. First Dist., Div. Three. Dec. 16, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT MICHAEL MILLS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of part III.

**COUNSEL**

Ozro William Childs, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Morris Beatus and Herbert F. Wilkinson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

MERRILL, J.—Appellant Robert Michael Mills was charged by information with murder (Pen. Code[1], § 187), corporal injury to a child (§ 273d), and child abuse (§ 273a, subd. (1)). In connection with the murder charge, it was alleged that Mills inflicted great bodily injury (§ 1203.075). The corporal injury charge alleged that Mills inflicted great bodily injury with serious felony consequences (§§ 12022.7, 1192.7, subd. (c)(8)), and that he was ineligible for probation (§ 1203, subd. (e)(3)). The child abuse charge contained the special allegations that Mills inflicted great bodily injury (§ 12022.7), and that he was ineligible for probation (§ 1203, subd. (e)(3)).

In the jury trial which followed, Mills was found guilty of first degree murder by torture, corporal injury to a child and child abuse. The jury also found true the great bodily injury enhancements alleged in connection with each count.

Mills was sentenced to state prison for 25 years to life. He appeals.

I

FACTS

The victim, Kari Ann Strong, was 25 months old when she died on June 29, 1988. Mills and Kari's mother, Nancy Strong Mills, were married on February 14, 1988. Trial testimony from Kari's pediatrician and pediatric nurse indicated that she had been physically and developmentally normal prior to the time of her mother's marriage to Mills. However, the evidence showed a dramatic change in Kari's well-being in the months following her mother's marriage, leading to her eventual death.

*Kari's Family Life With Mills*

In January and February 1988, a friend of Nancy's, Geri Punteney, lived in the Strong apartment with her eight-year-old daughter Bridgid. Geri described Kari at this time in her life as a happy child, laughing and playing with Bridgid.

At the time of his marriage to Nancy Strong, Mills had three sons of his own. Two of his three sons lived with the couple and Kari in the family apartment.

Several witnesses testified as to Mills's treatment of Kari. Mills regularly used obscenities when speaking to Kari. She would often be forced to sit in

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

an erect fashion for prolonged periods of time with her hands held on top of her head and the fingers locked together. One family friend, Marian Baker, stated that Kari would be required to sit this way for hours. If she did not hold the position, Mills would curse her loudly. On one occasion witnessed by Baker, Mills made Kari stay in this position for three hours. Mark Mills, Kari's stepbrother, stated that if Kari moved out of the position, Mills would slap her on top of the head, or strike her with either a spoon or plastic baseball bat. Baker also testified that she had observed Mills strike Kari on the top of her head, the back of her neck or flush in the face when she refused to eat.

On March 29, 1988, Kari was hospitalized for a torus fracture to the cortex of the tibia. The examining physician, Dr. Steven Olson, considered the fracture unusual because the type of pressure required to cause it is exerted along the entire length of the bone, with very little angular or rotational force. Dr. Olson had never seen such a fracture on a two-year-old. Additionally, her forehead was bruised and swollen.

Mills and Kari's mother told the doctor they did not know precisely what happened and suggested that Kari had bumped into the coffee table, or fallen off the bed. They only noticed she began to favor her right leg. Dr. Olson determined Kari should be evaluated as a possible victim of child abuse and informed Kari's parents of that fact.

Dr. Robert Scheibel performed a skeletal examination of Kari and discovered no additional abnormalities. He testified that he had only seen the type of fracture sustained by Kari where there had been application of abnormal physical force, e.g., in cases of falls from great heights and automobile accidents. Dr. Scheibel was asked to evaluate an explanation of this injury provided by Mills to the police after Kari's death. In this statement, Mills claimed he was holding Kari by the ankles upside down when he "unconscious-like" twisted her leg. When she cried, he flipped her upright into his arms and set her down. She then fell over injuring her knee. Dr. Scheibel testified that the injury could have been caused by Mills, who weighed 285 pounds, holding her by the ankles, then flipping her up and smashing her down into the ground on her heels or feet with all his might. The doctor stated he could not conceive of Kari's injury being caused in an accidental or unintentional fashion.

Dr. Scheibel's testimony as to the way in which Kari's injury occurred was corroborated by the testimony of Dr. John McDonald, an expert in emergency medicine. He confirmed the injury must have been caused by slamming Kari against a solid surface. The fracture would have been very painful.

At follow-up appointments with Dr. Olson on March 31, 1988, and April 7, 1988, Kari's leg appeared to be in good condition.

When Dr. Olson next saw Kari on April 19, 1988, her leg had healed. However, she had new symmetrical bruises on her cheeks. Dr. Olson stated the injury must have been caused by application of force from a blunt object. The doctor also noted that Kari displayed no emotion whatsoever during her examination, a condition known as "flat affect." He believed she had been beaten, informed Mills of his opinion and of his intention to notify child protective services (hereinafter CPS). Mills claimed Kari had been injured in a car accident, which explanation Dr. Olson found implausible because of the absence of abrasions on her nose. Dr. Olson called CPS that day.

*Evaluation for Child Abuse*

Jacquelyn Ritchie, a social worker with CPS, scheduled a visit with the Mills family on May 1, after being asked to delay the visit so that Nancy could be present. Ritchie noted that the parents were very cooperative. In her experience this indicated they had nothing to hide.

Ritchie's physical examination of Kari revealed several bruises and abrasions, each of which was explained away by the parents. There was a reddish spot on her forehead, fading bruises on her cheeks, and fading bruises in the upper buttock region. Nancy told Ritchie the forehead bruise was the result of a car accident and the cheek bruises had been caused by her stepbrother Michael squeezing her too hard. Mills claimed that he often roughhoused with Kari, tossing her into the air and catching her. Ritchie warned that because of his size and Kari's fragility as a petite two-year-old, he could cause Kari serious injury if he hit her. Mills indicated that he realized this and that they never used corporal punishment on Kari, using time-outs instead. Ritchie also informed Mills about the "shaken baby syndrome," about which he claimed to have knowledge.

From her interview, Ritchie concluded Kari's parents were nurturing and caring. Although Kari exhibited the classic signs of child abuse, e.g., listlessness, complete unresponsiveness, withdrawn personality, Ritchie believed the parents' story. She told the Millses she would have thought Kari was an abused child if not for what they had related to her. She thought Kari might be suffering from a physiological problem and suggested a full blood workup be done on her. The Millses agreed to this and to an informal family maintenance plan to be supervised by CPS. Ritchie referred Kari's case to the CPS family maintenance section.

Visits to Kari's regular pediatrician on three occasions in May 1988 revealed a perfectly normal blood workup. Her weight at 23 pounds, however, actually constituted a loss in weight and Nancy for the first time

mentioned that Kari was a picky eater. Nancy also stated that she had begun to notice new bruises on Kari every other day.

On May 18, 1988, at Kari's last pediatric checkup before her death, the nurse noted that she exhibited puffy lips with open sores. Mills, who was with Kari at this visit, related that Kari held food in her mouth too long. Kari still exhibited flat affect. The nurse telephoned public health officials while appellant and Kari were still in the examining room and told appellant that she had done so.

Julie Klein, a public health nurse with the County of Sonoma Public Health Department, received Kari's case from CPS. She visited the family on May 12, 1988, to assess overall development and report back to CPS. She testified that she had never before seen such a flat affect in a two-year-old. Kari sat like a silent statue at her mother's side, wholly unresponsive. Klein could not make eye contact with Kari. She noted that Kari refused to look at Mills when she walked to him. When Klein told the parents that CPS was concerned about child abuse, Nancy denied any abuse while Mills remained silent.

From developmental tests administered to Kari, Klein concluded she had no verbal skills at all and referred the case to a speech pathologist, Dr. John Samples. In meeting with Kari on May 27, June 10 and 21, 1988, Dr. Samples observed that she was a very quiet child unlike any other two-year-old he had seen. He also noted her flat affect and listlessness. Kari's understanding of words was within normal limits but her vocabulary was minimal. According to Dr. Samples, she refused to talk. In his report to CPS, Dr. Samples opined that Kari's speech delay was not related to any physical impairment, but was caused by something in her environment.

Kari had bruises on her left cheek, right chest, right forehead and right ear when Dr. Samples first saw her on May 27. By June 10, the bruise on her ear had become larger and by June 21, she was even more bruised, especially on her chest and lips.

Meanwhile, Kari's case had been assigned to Penny Reed, a social services worker with CPS's family maintenance unit. When Reed met with the family on June 17, she noted Kari's listlessness. Reed also saw bruises on Kari's forehead, her left cheek, and right thigh and her lips were raw. The parents told Reed that Kari was a poor eater. Mills stated that Kari refused to chew or swallow her food. During her visit, Reed noted that Mills told Kari to shut up when she made a small sound. When Reed questioned his command, Mills replied that children should not interrupt adults. Reed suggested that Kari had special needs and Mills said he would think about it.

*Testimony of Roommate Geri Punteney*

Nancy Mills's friend, Geri Punteney, and her daughter moved back into the Mills household on May 1, 1988. She immediately noticed that Kari was not the happy, playful child she remembered from January and February 1988. She had many bruises on her chin and forehead.

Punteney described several incidents she observed. The first time she saw Mills hit Kari was shortly after the middle of May while she was eating a meal. Kari was seated at the dinner table and eating her food very slowly when Mills slapped her on top of the head with his open hand. She started crying and Mills then slapped her even harder on top of her head. He then slapped her with his open hand in the back of the neck and her head jerked forward. She continued to cry very loudly. He then hit her very hard in the upper back area.

Punteney testified that the physical violence intensified in the last three weeks before Kari died. In the last weeks of Kari's life, Mills would hold her by grabbing her arm and hoisting her up to his waist level. He would not use another arm or hand to support the child. When she wore a sleeper, he would pick Kari up by grasping the back of her sleeper while her head faced the ground. He would also hold her upside down, feet to the ceiling and head toward the floor, while he was holding her two knees in his hands. Kari did not laugh. Punteney on one occasion saw Mills hold Kari upside down while holding only one of her legs. Her arms were outstretched. On one occasion Punteney saw Mills throw the child into her plastic playpen. Kari hit the bottom of her playpen very hard. In the last two weeks before Kari's death, on more than five occasions, Mills would drag Kari into his bedroom and close the door. Punteney described the sound that emanated from the bedroom on one occasion as a loud thunk on the carpeted floor, similar to the noise Kari made when Mills had thrown her into her playpen, but louder. Afterward she heard Mills say, "Kari, you didn't need to fall off the bed like that."

In the last three weeks of her life, Kari walked as though she was drunk, staggering from side to side. Also, Mills would poke her with his three fingers between her shoulder blades as she walked. He would hit her with his open hand in her mid-back area. If Kari walked too slow, Mills would kick her near her tailbone.

Punteney described the scenario between Mills and Kari at meal time during the last 15 days of her life. Kari ate very slowly. Food appeared to hurt her because of the deep cuts in her lips. She attempted to relieve the

pain by keeping her lips moist. She trembled during meal time, her right hand would quiver as she brought food to her mouth. Mills forced Kari to keep her head down and look at her plate while she was eating. If she did not stare at her plate, Mills would hit her. If she dropped a morsel of food, Mills would hit her and then make her put her hands on top of her head, with her fingers locked together, and close her eyes. While she was in this position, Mills would shove food into her mouth. Mills forced Kari to remain with her hands on top of her head for long periods of time, often for an hour and a half.

On two occasions observed by Punteney, Mills poked Kari in the eyes with his index and middle fingers. When she cried, he hit her in the back. When she still did not stop crying, he hit her with a flat open hand on the back of her neck. She was still crying, so Mills hit her again with a closed fist on the top of her head. This blow forced Kari's head down into her chest, reopening the cut in her lip and causing new bleeding.

Mills called two-year-old Kari "you bitch," "you whore," "you slut," and "you little asshole" in the last three weeks of her life.

Often when she was being punished during those last weeks, she was forced to lay rigidly on her parents' bed on her back with her fingers locked on top of her head for four or five hours at a time. Kari would also be required to sleep in this position on some occasions.

When Punteney was babysitting Kari several weeks before her death, Mills told Punteney that Kari must stay in his bedroom. Punteney did not abide by the rule, but eventually put her back in the bedroom. When Punteney told the child that her parents would be home soon, she assumed the position of lying on her back on the bed with her hands over her head. Punteney told her she did not have to get into that position. When Kari's parents returned, Mills noticed his radio dial had been touched and began hitting Kari. He hit her in the face and on the hands. Her nose began to bleed and her face became red. Kari cried loudly. Nancy Mills exclaimed that Kari was bleeding and Mills replied, "I don't give a shit, she knows better than to mess with our stuff." Punteney recalled that Kari's crying that night was louder than it had been previously when Mills hit her.

Mills confined Kari to her playpen the last few weeks of her life. He refused to allow her out to go shopping with Punteney on one occasion. One week before her death, she was only briefly allowed to participate in a barbecue the family hosted. While the family members and guests were outside by an inflated pool on that very hot day, Kari had to stay inside in

her playpen most of the time. At this barbecue Punteney recalled Mills hit Kari in front of the guests.

Mills would not permit Kari's mother, her stepbrothers or Punteney to hug or comfort Kari.

The week before she died Kari was wholly unresponsive. She could not keep her balance when she walked and she always kept her head down, bent at the neck.

In the last few weeks before Kari died, Mills's mother, Roselle, came to visit. Kari went to her and hugged her. Mills's mother asked why the child was trembling. Mills and his wife said they did not know. Mills told Kari to come to him and she obeyed, walking very slowly. After his mother left, Mills told Kari that she was lucky this time.

The last time Punteney was with the family at dinner time was a few days before Kari's death. Mills hit Kari very hard repeatedly with his closed fist on the top of her head. He also hit her on the back of her neck and on her back with his open hand. He also slapped her hands. Kari had done nothing to provoke the beating. She was simply eating.

Punteney recalled that on June 27, 1988, she got home from work and saw Mills spanking Kari's bare buttocks, as punishment for her attempts at potty training.

On June 28, 1988, Punteney came home from work, changed out of her work clothes and then took her daughter out for dinner and a movie. They returned to the apartment around midnight. Kari was asleep in the punishment position with her hands on top of her head, and her fingers intertwined. Soon thereafter, Kari began to cry. Mills went to the playpen where she slept and announced that she had vomited and that she had diarrhea. Mills yelled at her that she "got shit everywhere." He washed her in the bathtub, cleaned her bedding and then threw her back into the playpen and told her to go to sleep.

Kari was restless and did not sleep. Mills was in and out of her bedroom all night long, yelling at her to go to sleep. He said, "I told you to put your fucking hands on your head and close your eyes and get some fucking sleep." Punteney could not sleep herself because of the sound of Mills hitting Kari all night long. Kari wept.

At some point during the night, Kari was lying on her side. Mills went to her playpen, flipped her over and slammed her down, yelling at her to keep

her hands on top of her head. He threatened, "If I see you out of that position again, I'll kick your fucking ass."

*The Events of June 29, 1988*

Appellant's son, Mark Mills, was 10 years old at the time of Kari's death. He testified that he was in the family's apartment with Mills, his brothers Mikey and Brandon, who were respectively, three and four years old at the time, and Kari. On the afternoon of June 29, 1988, Mills and Mark were playing a Nintendo game while Brandon watched them. Kari was supposed to be napping in her playpen in her parents' bedroom but Mikey went into the room and she awoke. Mills went into the bedroom. Mark then heard a loud thump and then a person screeching. Mills came out of the bedroom and told him to help Kari while he called an ambulance. Mark saw Kari lying on the bed with her eyes closed and blood running from her nose. She did not move. According to his father's instruction, Mark took a washcloth and cleaned Kari up, wiping the blood from her nose. He found that her lip was bleeding as well.

Mark testified that Mills first attempted to reach Nancy on the telephone but was unsuccessful and then dialed for an ambulance. Mills sent Mark outside to wait for the ambulance. Brandon went with him. When the boys returned to the apartment, Brandon noticed a hole in the bedroom wall that previously had not been there.

Firefighters Thomas Cozine and Joaquin Barton arrived at the apartment at 3:49 p.m., within three minutes of Mills's telephone call to 911. Kari was lying on the waterbed. She was not breathing. She appeared very pale or gray. However, her pulse was strong. Cozine administered oxygen which improved her color, but her pulse faded within minutes.

Mills told Cozine that Kari had been jumping on the bed and had possibly fallen onto the headboard of the bed.

Barton carried Kari to the ambulance, and Cozine and Barton administered CPR as they went. Barton did not bump into anything as he took her to the ambulance. Kari was not wearing a shirt and both firemen observed numerous bruises on her head and chest. The firemen and the paramedic and nurse attending the ambulance described Mills as frightened but not distraught.

Kari's air passage was not obstructed by vomit or any other object. When she was placed in the ambulance, Kari had no pulse, no blood pressure and

was not breathing. On the way to Santa Rosa's Memorial Hospital, the paramedic Jerry Regan, inserted an air tube into Kari's throat. The firemen and medical personnel who had attended to Kari testified that they did not cause any of the injuries on her body in their attempt to save her life.

On the way to the hospital Mills told Regan that Kari had been bouncing on the bed, he asked her to stop, but she fell off the bed and struck her head on the floor. Because of the number of bruises on Kari's body, Regan asked whether she had fallen more than once and Mills replied that she had not. In answer to additional questions, Mills stated that she had not hit any surface other than the carpeted floor and that she had not had any seizure-like activity after falling. To the ambulance nurse, Mills stated Kari fell while standing on the bed, striking the nightstand and then the floor.

The ambulance arrived at the hospital within five minutes. At this point Kari's skin appeared bluish in color, she was still warm, but her skin was very dry. The dryness of her skin was a sign that her body was not attempting to combat the trauma.

Dr. Tucker Bierbaum, a specialist in emergency medicine, treated Kari at Memorial Hospital. He had an intravenous tube inserted in Kari and administered electric shocks to her heart. There was no response. Eventually, after approximately eight minutes, he was able to establish a heartbeat.

Dr. Bierbaum and Dr. Frank Miraglia, the on-duty pediatrician, did not believe Kari would survive. She was in the deepest possible comatose state. Dr. Bierbaum testified that Kari had multiple bruises of varying ages about her head and chest areas. There were numerous bruises to the side of her head, to her nose, to the top of her foot and along her left arm and forearm. A contusion to her groin area struck Dr. Bierbaum as highly unusual. In such an injury, the skin is not broken but the blood vessels underneath the skin are ruptured, causing discoloration. Dr. Bierbaum had never seen an injury like that on a two-year-old but had observed similar injuries in football players. Dr. Miraglia opined that the injury to Kari's groin could have been caused by torque or application of twisting force along the skin line. Numerous bruises she exhibited were in "unusual" locations, i.e., not on the elbows, knees, forehead, chin, etc., where a normal two-year-old might be expected to injure herself from a fall or accident. Such injuries would be accompanied by abrasions and the majority of Kari's bruises could not be considered normal.

Dr. Miraglia noticed the same bruises to the child as those observed by Dr. Bierbaum. In Dr. Miraglia's opinion, the location of certain of the bruises to

the bridge of the nose, her eyes, the groin and two finger marks on her arm were indicative of child abuse. Additionally, Kari had bilateral retinal hemorrhages, usually caused by violent shaking of the head, which is indicative of child abuse. He stated that Kari was the most clear-cut case of child battering he had seen in his practice.

A CPS social worker, John LaLonde, interviewed Mills while Kari was still being treated at Memorial Hospital. Mills related that Kari was supposed to be napping that afternoon and instead she was jumping on the bed. He yelled at her to lie down and take a nap at which point she fell, hitting the headboard, the nightstand and then the floor. Mills saw that blood was flowing from her nose and that she was having trouble breathing. He first placed her on the bed and then picked her up from the bed at which point she slipped through his arms, hitting her head on the floor again. He also stated he performed the Heimlich Maneuver on her.

Although Kari was functionally dead, Doctors Bierbaum and Miraglia transferred her to Children's Hospital in San Francisco by helicopter. Dr. John Tsukahara, director of Children's Hospital's pediatric intensive care unit, testified that she was brain dead when she arrived but because it appeared her death had been caused by nonaccidental trauma, he decided to keep her on life support systems for additional testing. Retinal bleeding observed on Kari was the result of severe trauma such as violent shaking or a blow to the head.

Kari was ultimately declared dead at Children's Hospital at 2 p.m. on June 30, 1988. Kari died as a result of cardiac arrest. Dr. Bierbaum's opinion was that one or several blows to the head were the cause of her cardiac arrest. She had suffered severe injury to her brain stem.

Dr. Tsukahara, a physician with extensive experience with cases of child abuse, determined that Kari had been a victim of such abuse. Dr. Tsukahara testified that the 20 or more bruises on Kari's trunk of various ages, her "failure to thrive" or poor growth rate, her sustained weight loss, the lip injuries indicating a blow on the head, driving the teeth into the lips, knuckle-patterned injuries on her head and cheeks from a hand or fist, her chest lesions and nose bruises were all signs of child abuse.

Dr. Tsukahara testified that a child's weight loss at a time when he or she should be gaining weight could be attributed to being struck repeatedly during mealtime. A child suffering from blows to the back of the neck or the top of the head would experience pain while eating. Additionally, the doctor stated that a child exhibiting flat affect is highly indicative of chronic and severe abuse.

*Evidence at the Scene*

Sonoma County Sheriff's Office Identification Technician Robert Stowe examined the Mills apartment at some time before 7:15 p.m. on June 29, 1988. His examination of the master bedroom revealed very few surfaces upon which a child could be injured. The room was clean and tidy. A very fine layer of dust on the nightstands indicated to Stowe that they had not been disturbed. There was no blood or hair on the nightstands or chest of drawers. The only sign that a trauma had occurred in the master bedroom was a depression in the south wall approximately 30 inches from the floor and what appeared to be blood just below the depression. Stowe tested the depression for the presence of blood with a hemostick. Also, Stowe seized a wet towel or washcloth which appeared to have blood on it. Stowe cut out the portion of the wall containing the depression and the apparent blood-stains.

Testing by a department of justice criminalist of the portion of the master bedroom wall revealed four areas of bloodstains. The criminalist concluded that one of the areas had human blood. The remaining bloodstained areas did not contain enough of a sample to allow for further testing. Nor was there enough of the human blood to conduct further testing as to blood type. The areas of wall displaying bloodstains had been wiped or otherwise diluted. The washcloth also contained human blood which the criminalist determined was type O.

*Mills's Statement to the Police*

Mills did not testify. However, his statement to Sonoma County Sheriff's Office Detective Randy Biehler, taken at 10:26 p.m. on June 29, 1988, was admitted into evidence at trial. Mills stated that, after playing Nintendo with Mark, he checked on Kari and found her running on the bed with a washrag on her head. He yelled at her to go to sleep and she turned and fell striking the nightstand and then the floor. He laid her back on the bed and then noticed she was not breathing. He picked her up to burp her but she fell out of his arms to the floor. He picked her up again and found that he could not feel her pulse. Suddenly, he felt a pulse and he told his son to blow in her mouth. Mills said he also attempted to give her CPR, but Kari started to vomit. He also attempted to revive her by spanking her, shaking her, slapping her cheek, pressing on her stomach and patting her on the head. He saw some blood and attempted to wipe it off with a washcloth.

*The Autopsy Report*

Dr. Boyd Stephens, chief medical examiner for the City and County of San Francisco, performed the autopsy on Kari. He stated the cause of death

was multiple traumatic injuries; that is a combination of head injuries, the subdural hematoma, the edema, the mesenteric hemorrhage, and her nutritional status. Dr. Stephens reported that she had more than 40 bruises on her body.

From dissection Dr. Stephens discovered a large triangular injury to the top of Kari's head which, from the size of the injury, could have been caused by a fist. This head injury most likely caused her subdural hematoma. Dr. Stephens concluded that the most likely cause of Kari's cardiac arrest was the subdural hematoma. She also had suffered severe cerebral edema to the point where her brain was pushing out against her skull. In Dr. Stephen's opinion Kari's head injuries were clearly the result of blunt trauma, specifically, blows to the head.

He also found that Kari had suffered an extensive hemorrhage to the mesentery, a heavy membrane in the area of the kidney. The injuries to the mesentery were of two or three ages, some as old as ten to fifteen days and some as recent as at the time of hospitalization. Injury to mesentery is usually associated with great force, such as a fall from multiple stories, collisions or abusive blows. This injury alone could have caused Kari's cardiac arrest.

The unusual stretch-type abrasion to her groin area was the result of the exertion of great force at an angle, shearing Kari's skin. Dr. Stephens described that the injury was possibly caused by a "wall-banging" incident, seen in cases of child abuse, in which the child is grabbed by the arm and flung into a wall.

The position of older bruises to her chest was consistent with thumb marks where someone would grab and violently shake a baby. There were also a series of oval-shaped bruises to the right calf and front left leg. A series of bruises observed in Kari's upper back area and pelvis area were three to five days old. Kari also had bruises to the bottom of her left foot. A large area of bruising was apparent behind her right ear. The doctor concluded these injuries would not have been caused in the course of a child's play. A series of bruises and lacerations, described as blunt trauma injuries, were also observed on her lips. The injuries to her top lip were from a direct blow and those to her bottom lip were caused by impacts from the front driving the lip into the teeth. Dr. Stephens opined these injuries would not likely have been caused during resuscitation procedures.

Additionally, Dr. Stephens found numerous subcutaneous hemorrhages in the skull lining and retinal hemorrhages. The doctor stated the retinal

hemorrhages were most likely caused by blows to the top of Kari's head and not violent shaking.

Finally, Dr. Stephens testified that Kari did not die from a single blow but from repeated blows over a period of time. Such repeated striking would have caused Kari to stagger as though she were intoxicated. The most recent blows were to the top of her head.

## II

### Discussion

*Death by Torture*

■ Mills contends his conviction must be reversed as there is insufficient evidence of torture. First, he submits the only possible conclusion the jury could draw from the evidence was that Kari's death was caused by a single blow to the top of her head and that this cannot constitute torture. He argues no medical evidence showed that any other trauma individually or taken together caused her death. We disagree.

■ " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) In reviewing the sufficiency of the evidence, the appellate court must view the evidence in the light most favorable to the respondent, presuming in support of the judgment every fact which the trier could reasonably deduce from the record. The court must first resolve the issue in light of the whole record, not simply the evidence selected by the respondent. Second, the court must evaluate the substantiality of each of the essential elements. (*Id.*, at pp. 576-577; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 318-319 [61 L.Ed.2d 560, 573-574, 99 S.Ct. 2781].)

■ The coroner, Dr. Boyd Stephens, testified that Kari's death was caused by "multiple traumatic injuries," specifically the "combination of the head injuries, the subdural hematoma, the edema, the mesenteric hemorrhage, the nutritional status, all those things combined." Evidence emphasized by Mills does not lead to the sole conclusion that a single blow to the head was the cause of Kari's death. When asked whether her head injury or mesenteric injury was the more likely cause of death, Dr. Stephens responded that head injury was the more likely cause "[b]etween those two

choices." Additionally, while Dr. Stephens opined that Kari's cardiac arrest was caused by a massive subdural hematoma and that head injuries had caused the hematoma, he did not testify that only a single blow caused the hematoma. In fact, Dr. Stephens stated that while the hematoma may be from just one blow, "some markers" suggested to him that it was the result of "coalescing" of two or three separate injuries. From this evidence a reasonable jury could clearly conclude that more than one blow caused Kari's death.

■ The crime of murder by torture requires a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain. (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].) ■ Mills contends that there is no evidence that his final blow or blows to his stepdaughter were part of such a deliberate and premeditated intent. He argues his final beating was separate in time and intensity to previous beatings and further, that more than child abuse is required for a conviction of murder by torture.

Our review of the record in this case leaves no doubt that there was sufficient evidence of a deliberate and premeditated intent to inflict extreme and prolonged pain. Numerous eyewitnesses testified as to the violent physical abuse the 285-pound Mills inflicted upon the child from March 1988 until her death on June 30, 1988. The testimony of Geri Punteney alone, as to the beatings Kari suffered at the hands of Mills, was sufficient evidence of a deliberate intent to inflict extreme and prolonged pain. Punteney's testimony as to Mills's violent conduct the last two weeks of Kari's life was particularly telling. Punteney described how Mills would literally throw the child into her playpen, how he would hit her with a closed fist on the top of her head to stop her crying, how he would poke her in the eyes and back, slap her in the face, hoist her in the air by grabbing her knee, and force her to remain for hours with her hands locked on top of her head. Additionally, the jury heard Punteney's testimony as to the obvious pain Mills inflicted upon Kari at meal time, specifically the repeated blows to the side, back and top of Kari's head while she attempted to eat. The night before Kari died Punteney graphically described the mistreatment administered to Kari by Mills all night long, including slamming her down into the playpen and ordering her to reassume the position of holding her hands over her head.

Mills's contention that his final beatings of the two-year-old were separated by time from previous beatings is entirely inconsequential. The evidence remains that Mills perpetrated an entirely deliberate vicious course of conduct against the helpless child over a course of three to four months, intensifying the beatings in the last few weeks of her life. There is no

question that Mills's acts were part of his wilful, deliberate and calculated intent to inflict pain on Kari.

Mills also asserts error in the trial court's reliance on the opinion in *People v. James* (1987) 196 Cal.App.3d 272 [241 Cal.Rptr. 691], in denying his motion for acquittal (§ 1118.1) of the murder count. He argues that the facts of the instant case did not justify the trial court's reference to *James* as controlling and that the more appropriate authority was *People v. Steger, supra,* 16 Cal.3d 539.

In *Steger*, our Supreme Court held that there was insufficient evidence to support a finding of torture murder where the defendant's acts constituted only misguided, irrational and wholly unjustifiable attempts at discipline. *Steger* analyzed that the mental state of a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain were not demonstrated by the defendant's beatings of the child in uncontrolled outbursts of frustration. (*People v. Steger, supra,* 16 Cal.3d at pp. 546-549; see also *People v. Walkey* (1986) 177 Cal.App.3d 268, 275-276 [223 Cal.Rptr. 132].)

The Court of Appeal in *James* reviewed the *Steger* opinion in holding that substantial evidence of murder by torture was presented in the *James* case. "Unlike the defendants in *Steger* and *Walkey,* James's various acts of cruelty toward Christa were not for the most part disciplinary in nature, nor done in explosive fits. On the contrary, when James abused Christa—both physically and emotionally—he was often cool and calm." (*People v. James, supra,* 196 Cal.App.3d at p. 293.) The *James* court noted the sadistic nature of the defendant there was evident from the circumstances surrounding how she incurred the physical injuries, her fatal injury, and the acts of torment he perpetrated upon her. Examples of his sadistic behavior include when James forced his three-and-a-half-year-old stepdaughter to lick urine off a car seat, deliberately popped her balloon at a party and told her to jump out of a moving car. (*Ibid.*) The evidence in *James* revealed that the victim suffered injuries at the defendant's hands over a six-month period beginning with bruises and a broken leg leading to her fatal injury. The victim ultimately died of multiple internal injuries caused by a blunt force, such as a punch or a kick. Additionally, the defendant had forced his stepdaughter to ingest cigarettes and 151 proof rum shortly before her death. The Court of Appeal found the circumstances surrounding her fatal injuries as well as his prior conduct toward the victim to be substantial evidence of torture murder and distinguished the case from *Steger.*

The trial court did not err in relying on the *James* opinion and distinguishing *Steger.* That the beatings were the product of a calculated, deliberate

intent to inflict pain is demonstrated by the fact that Mills was fully aware that his violent behavior endangered Kari. He had been informed of such fact by social workers and acknowledged the danger. Additionally, the evidence that Mills struck her while she was eating, poked her eyes, hit her with great force on the top of the head, slapped her in the back of the head and neck, kicked her in the tailbone and used profanities or threats of future violence, where Kari's conduct had done nothing to provoke the beating, is additional evidence that his acts were not merely misguided attempts at discipline. Further, his act of forcing her to assume the position of her hands intertwined on top of her head for hours at a time far exceeds any disciplinary attempt or outburst of frustration on his part. Statements made by Mills such as, "Kari, you didn't have to fall off the bed like that," after he slammed her into her playpen, are also evidence he intended to cause her pain. Additional evidence that Mills's acts were not merely explosions of violence or misguided disciplinary attempts is presented by the testimony that Mills beat and punched Kari upon the suspicion that she touched his radio dial. When Nancy shouted to him that Kari was bleeding, he coldly replied that he "didn't give a shit."

That he wanted to cause her torment is also evident from his refusal to allow others to hug or comfort her. Finally, another brutal example that his acts were not mere disciplinary attempts, is demonstrated by the evidence that the night before her death, Mills grabbed her out of the playpen where she was sleeping and yelled at her, "If I see you out of that position again, I'll kick your fucking ass." These examples from a record replete with cruel, tormenting acts clearly intended to cause Kari pain, provided the jury with substantial evidence that Mills had the requisite mental state for torture murder.

We find no merit in Mills's argument that the evidence presented in his case is merely repeated child abuse and not murder by torture. He urges that his intent was only to have a totally obedient and docile two-year-old and not to inflict pain. To the contrary, it is evident from the totality of Mills's acts toward the child that he intended to cause her extreme pain and suffering. Mills's conduct clearly describes murder by torture.

*Instructional Error—CALJIC No. 8.24 Proximate Cause of Death*

The trial court provided the following instruction on murder by torture: "The essential elements of murder by torture are: One, one person murdered another person; and two, the perpetrator committed the murder with a wilful, deliberate and premeditated intent to inflict extreme and prolonged pain on a human being for the purpose of persuasion for a sadistic purpose or for any sadistic purpose."

Mills urges that the court prejudicially erred by not also delivering, sua sponte, a bracketed portion of CALJIC No. 8.24 (5th ed. 1989 pocket pt.). This instruction reads: "[3. The acts or actions taken by the perpetrator to inflict extreme and prolonged pain were [a] [the] [proximate] cause of the victim's death.]" While the jury was instructed as to the standard proximate cause instruction provided in CALJIC No. 8.55,[2] Mills submits that without the bracketed portion of CALJIC No. 8.24 relating proximate causation to murder by torture, the jury could not have given the appropriate consideration to proximate causation. We disagree.

It is well settled that in determining the sufficiency of jury instructions, we must consider the entire charge of the court. Additionally, we must assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. (*People* v. *Crandell* (1988) 46 Cal.3d 833, 874 [251 Cal.Rptr. 227, 760 P.2d 423], cert. den. *sub nom. Crandell* v. *California* (1989) 490 U.S. 1037 [104 L.Ed.2d 408, 109 S.Ct. 1936], citing *People* v. *Burgener* (1986) 41 Cal.3d 505, 538-539 [224 Cal.Rptr. 112, 714 P.2d 1251]; *People* v. *Kegler* (1987) 197 Cal.App.3d 72, 80 [242 Cal.Rptr. 897].)

In the instant case, there is no question that the instructions as a whole properly informed the jury of the requirement of finding that Mills's torturous acts were the proximate cause of Kari's death. Aside from CALJIC No. 8.24, the court had instructed that "the crime of murder by torture requires the specific intent to inflict extreme and prolonged pain upon a living human being for the purpose of persuasion for a sadistic purpose or for any other sadistic purpose," and that "every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder . . . ." Taken together, these instructions adequately inform any reasonably intelligent juror of the requirement of finding that Kari's death was proximately caused by Mills's acts.

Further, in *People* v. *St. Joseph* (1990) 226 Cal.App.3d 289, 296 [276 Cal.Rptr. 498], the court rejected an argument, similar to the one advanced by Mills here, that it was error not to give the bracketed portion of CALJIC No. 8.24. The *St. Joseph* court analyzed that a causal relationship between the torturous acts and the murder has never been held to be an explicit element of torture murder by our Supreme Court. (*People* v. *St. Joseph,*

---

[2]CALJIC No. 8.55 (5th ed. 1988) provides: "To constitute [murder] [or] [manslaughter] there must be, in addition to the death of a human being, an unlawful act which was a proximate cause of that death. [¶] A proximate cause of a death is a cause which, in natural and continuous sequence, produces the death, and without which the death would not have occurred."

*supra*, 226 Cal.App.3d at p. 296, citing *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1101 [259 Cal.Rptr. 630, 774 P.2d 659], cert. den. *sub nom. Bittaker* v. *California* (1990) 496 U.S. 931 [110 L.Ed.2d 651, 110 S.Ct. 2632], and *People* v. *Wiley* (1976) 18 Cal.3d 162, 168 [133 Cal.Rptr. 135, 554 P.2d 881].) The court held that in torture murder cases the necessity of finding a causal relationship between the torturous acts and the murder is an implicit part of the torture murder requirement that " 'the act or acts *which caused the death* must involve a high degree of probability of death.' " (*People* v. *St. Joseph, supra*, 226 Cal.App.3d at p. 296, italics in original.)

*Evidence of Murder*

 Mills contends there was insufficient evidence to support his murder conviction as it was not shown that the final blow was struck with express or implied malice. He bases his argument on the premise that Kari's death was caused by a single final blow to the top of her head. In view of the record in this case, we find this contention unpersuasive.

First, as we have concluded previously, the evidence supports a finding that Kari's death was not caused by the final single blow to the top of her head but by the multiple traumatic injuries she suffered. The record contains ample evidence of implied malice when we examine the evidence indicating how she incurred these multiple traumatic injuries. Implied malice is defined by section 188 as "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." As often expressed by our appellate courts: "Malice is evidenced by circumstances indicating that the killing was proximately caused by an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . . [Citation.]" (*People* v. *Summers* (1983) 147 Cal.App.3d 180, 184 [195 Cal.Rptr. 21], internal quotation marks omitted; see also CALJIC No. 8.11 (5th ed. 1988).)

 Testimony here demonstrated Mills's repeated striking of her head and neck, especially during the final two weeks of her life, his habit of throwing her down into her playpen, his act of slamming her to the floor feet first with great force, his violence causing the unusual groin injury, his swinging her by her legs in a manner causing a tremendous twisting force, and his violent shaking of the child. It must be remembered that Mills, a 285-pound man, was committing these deliberately cruel acts upon a 24-pound child. That Mills was aware of the potential endangerment of such brutality upon Kari is supported by the evidence that he had indicated to one

of the social workers that he knew the damage a person of his size could cause to a small child. Mills's intentionally violent acts toward Kari were brutal and vicious and obviously an endangerment to her life. From the evidence we enumerated, as well as the numerous other violent and physically endangering acts committed by Mills against Kari, the jury could reasonably conclude he killed her with malice aforethought.

*Corporal Injury on a Child and Child Abuse*

 The counts alleging corporal injury on a child and child abuse related to the torus fracture of Kari's tibia for which she was hospitalized on March 29, 1988. Mills's contention is that there was insufficient evidence to convict him of these offenses as the only evidence connecting him to the offense was his own statement to the police that the injury occurred accidentally while he was holding Kari upside down and he "unconscious-like" twisted her leg. According to his statement, he then flipped her right side up, and set her down and she fell and injured her knee. Mills asserts that there is no substantial evidence that he intentionally caused Kari's injury as charged in these two counts because other than his own statement there is no evidence of how Kari was injured. Mills asserts that the jury could draw only two conclusions from the evidence; either that the actions he described did *not* cause her injury or that his actions did cause her injury by some combination of twisting and pulling forces. Mills argues that the jury must have rejected the theory that his actions did not cause Kari's injury and believed that his swinging of Kari in the air caused her fracture by some combination of twisting and pulling force. From this deduction, Mills reasons the corpus delicti of the offense, that the injury was wilful and intentional, was not proven by any evidence other than his own statement to the police. Mills's argument is flawed in many respects.

In the first instance, it is not required that direct evidence of the manner in which the injury occurred be introduced to the jury. Circumstantial evidence is sufficient to prove intent. Mills's contention presumes that the jury accepted his version of the event in its entirety. On the contrary, the jury could reasonably have concluded that he slammed Kari into the floor. The evidence showed that Mills had provided different versions of how the injury occurred. Moreover, Dr. McDonald testified that the action described by Mills of flipping Kari in the air could not have caused her fracture. Additional medical testimony also supported the conclusion that the injury was intentional. Dr. Olson, the treating physician, opined that the fracture was the result of significant force applied at one end of the bone along its axis "with very little rotational force and very little angular force" and that it was caused by an impact along the bottom of her foot. Dr. Olson stated it was the

application of force from the bottom that made the fracture unusual. He also concluded that Kari was a possible victim of child abuse. Dr. Scheibel, who performed a skeletal scan on Kari in connection with this injury, testified that the fracture was the result of unusual or abnormal forces, i.e., greater than a child could cause to himself or herself unless there was a fall from great heights. He stated the injury may have been caused by a twisting force or by forcibly jamming the child down in a twisting motion or by violently swinging her around by the leg in the air. He believed the most likely cause was some combination of an axial and twisting force. He could not conceive of Kari's injury being caused in an accidental or unintentional fashion. Dr. John McDonald described torus fractures as the result of the application of great force. He stated the injury may have been caused by slamming the child with tremendous force straight down into the floor with her ankle first hitting the ground. Finally, Dr. Frank Miraglia also concluded that slamming the child down on one foot with great force could have caused Kari's fracture. He testified that torus fractures are associated with either a rotational type of injury when one part of the leg is fixed and the other part is rotated, or when there is force applied down the axis of the bone. The medical testimony provided the jury with ample evidence that the injury was intentionally caused.

There is also no merit in Mills's argument that the corpus delicti of these offenses, that Kari was injured and that the injury was wilful and intentional (§ 273(d)), was not proven independent of his own admission. The doctors' testimony that the application of great force was required to cause Kari's injury and that the injury was not accidentally caused allowed the jury to deduce that the injury was intentionally caused. ■ Corpus delicti may be proved by circumstantial evidence and need not be proved beyond a reasonable doubt. A slight or prima facie showing, allowing a reasonable inference that a crime was committed, is sufficient. (*People* v. *Ruiz* (1988) 44 Cal.3d 589, 610 [244 Cal.Rptr. 200, 749 P.2d 854].) ■ Corpus delicti was adequately proven in this case. That Mills's admission was the only direct evidence that *he* was connected to the offense is inconsequential to corpus delicti.

### III

### CLAIMS OF PROSECUTORIAL MISCONDUCT*

. . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 898.

## IV

### DISPOSITION

The judgment is affirmed.

White, P. J., and Chin, J., concurred.

A petition for a rehearing was denied January 2, 1992, and appellant's petition for review by the Supreme Court was denied March 19, 1992.