UNITED STATES of America,
Plaintiff-Appellee,

v.

Christopher HUGHES, Defendant-
Appellant.

No. 396, Docket 32875.

United States Court of Appeals
Second Circuit.

Argued Feb. 18, 1969.

Decided May 26, 1969.

Robert S. Rifkind, Washington, D. C.,
for appellant.

John H. Doyle, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., for the Southern District of New York), for appellee.

Before Mr. Justice CLARK,* WATERMAN and FRIENDLY, Circuit Judges.

CLARK, Associate Justice:

The appellant stands convicted of a conspiracy, consummated in New York, to use the facilities of interstate commerce in furtherance of a scheme to extort money from one Morris Cohen in North Carolina in violation of 18 U.S.C. § 1952.[1] The gist of the offense is that appellant conspired to entice Cohen into a compromising situation in New York, steal his wallet and identification cards and thereafter use the same to extort money from him in North Carolina. The case was here before and was remanded for a new trial on grounds not here involved. 389 F.2d 535 (1968). On remand the appellant was again convicted before a jury.

At the outset it is well that we point out that about a month before this case was submitted the Supreme Court of the United States decided United States v. Nardello, 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487. There Chief Justice Warren for a unanimous Court found that the generic term "extortion" as used in § 1952 covered the acts committed in this case. Indeed, he referred to this case by name in footnote 2, page 288, 89 S. Ct. page 536, and specifically found that appellant "was charged with involvement in a scheme identical to that in which"

Nardello participated. This makes our task much easier since it not only gives us helpful guidance but disposes of appellant's claim that North Carolina's blackmail statute cannot be equated to the requirement of extortion in § 1952. *Nardello* holds to the contrary.

■ Appellant argues, however, that the threat to be made in North Carolina to arrest Cohen for the offense of sodomy committed in New York—outside of the State of North Carolina—was not within the prohibitions of the blackmail statute of North Carolina. Other questions raised include a failure of evidence; the use of the testimony of a co-conspirator at the former trial who was incompetent to testify at the second one; the refusal of the trial judge to admit psychiatric testimony as to the mental condition of the same witness as affecting his credibility; and the failure of the trial judge to open for inspection the grand jury minutes in support of an allegation that the indictment was based solely on hearsay. We find no merit in any of these contentions and, therefore, affirm the conviction.

I.

As indicated the conspiracy charged had to do with a scheme, known as "the shakes," to extort money from homosexuals. The overall plan of operation was that a person, known in the business as "a chicken," would steal the wallet and credentials from another person with whom he had homosexual relations. The wallet and credentials, known as "a poke," would then be passed on to others in the racket who, posing as police offi-

---

* Associate Justice, United States Supreme Court, Retired, sitting by designation.

1. Title 18, United States Code, Section 1952:
   "Interstate and foreign travel or transportation in aid of racketeering enterprises
   "(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
      *      *      *      *      *

   "(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
   "(b) As used in this section 'unlawful activity' means * * * (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." Gov't brief, p. 2.

cers, would "play" the victim by threatening him with exposure and arrest for the offense of sodomy. In this manner the victim would be induced to pay for the dropping of the charges or to deposit a cash appearance bond, as in United States v. Schwartz, 398 F.2d 464, 7 Cir. 1[2] also discussed in *Nardello, supra,* 393 U.S. at 294, 89 S.Ct. 534. The indictment alleged a conspiracy between appellant and three co-conspirators, Rochford, Kaminsky, and Hammock, to carry out such a scheme but charged only appellant and Rochford with the offense.

The Government proved that appellant obtained the wallet and credentials from the victim, Cohen, in the latter's hotel room in New York City and gave it to Rochford for the purpose of delivery to Kaminsky who was to "play" Cohen. Kaminsky called co-conspirator Hammock, who lived in Cohen's home town, to see if the latter was a likely victim. Hammock reported back that Cohen looked "like he might be a $10,000 man. He is certainly well worth playing for." Rochford, on being informed, advised appellant and later took the wallet and credentials to Kaminsky and Hammock in person in Durham, North Carolina. At that time "a phony" arrest warrant on New York Municipal Court printed forms was drawn up by Kaminsky for the arrest of Cohen on a charge of sodomy and a spurious "confession" was typed up which falsely recited homosexual activity between appellant and Cohen on the occasion mentioned in New York. Armed with these papers and with false police identification badges and credentials, Hammock then drove Kaminsky and Rochford to Cohen's home. The latter two went in to see Cohen but he was out of the city. Some three weeks later, with appellant's knowledge, a second attempt—this time by Hammock and Kaminsky—was made but Cohen was in Puerto Rico. Thereafter on a trip to Florida, Kaminsky and Hammock misplaced a suitcase containing "the phony" warrant, badges and identifications along with Cohen's wallet and credentials. It fell into the hands of Florida police and this prosecution resulted.

At the first trial Rochford pleaded guilty and testified against the appellant. Hammock was the Government's star witness and Kaminsky was a fugitive. Appellant testified on his own behalf.

At this, the second trial, Rochford, who was then serving a two-year term on his plea of guilty, was found to be suffering from schizophrenia and incompetent to testify. The Government then offered his testimony given at the first trial. On objection a full hearing was held, without the jury. Dr. Kinzel, a psychiatrist, testified for the defense that he was under the impression that Rochford was suffering from schizophrenia before and during the first trial and that "the illness was getting worse all of the time." But he said that he could not with any degree of medical certainty say that Rochford's illness had progressed to such an extent in June 1967, immediately before the time of the first trial, that he would be subject to suggestion. He found him incompetent to testify at the second trial, however. The record showed that while Rochford had been treated for epilepsy and was taking medication for it prior to the time of the first trial, there was nothing indicating schizophrenia at that time. It was stipulated that if Dr. Ciccone, the Director of the Government Medical Center at Springfield, were present, he would testify that Rochford was competent to testify at least until May 1, 1968, when he last examined him. The first trial was held in July 1967. Daniel Isles, Rochford's attorney at the first trial, testified that he represented Rochford for 13 months prior to the time of that trial and had conferred with him on many occasions during that period. He said that Rochford "could state everything from A to Z in connection with the matters" that he inquired about;

2. The petition for certiorari was denied, *Pyne v. United States,* 393 U.S. 1062, 89 S.Ct. 714, 21 L.Ed.2d 705 (1969).

that he "knew exactly what he was doing concerning every aspect of the entire situation." While Isles knew of Rochford's epilepsy he said that he evidenced no traces of the disease in his conduct. The court on this evidence permitted the reading to the jury of the testimony of Rochford at the first trial. The defense made an offer of proof of Dr. Kinzel[3] as to the credibility of this testimony and it was refused. The court did instruct the jury in this regard.[4]

Appellant's testimony at the first trial was also admitted in evidence over his objection. It denied some of the details as to how he secured possession of the Cohen wallet and credentials but admitted giving it to Rochford. Appellant insisted, however, that he knew nothing of the conspiracy and that Rochford, a friend of 15 years, had framed him. He admitted having been in "the shake" business; of using a police badge in Philadelphia to extort money from homosexuals; of "rolling" homosexuals and taking their "pokes" which on two occasions he had given to Rochford; and

that he knew that Rochford operated with Kaminsky and Hammock.

## II.

As the Supreme Court held in *Nardello, supra,* the Travel Act was adopted "to aid local law enforcement officials." *Id.,* 393 U.S. at 290, 89 S.Ct. at 537. The congressional purpose was to prevent the mobile modern professional criminal from violating certain state laws with impunity by skipping back and forth across state boundaries. It made it a federal crime to travel in or use the facilities of interstate commerce to promote "extortion" in violation of state or federal law. As the Chief Justice said in *Nardello, supra:*

> "The Travel Act, primarily designed to stem the 'clandestine flow of profits' and to be of 'material assistance to the States in combating pernicious undertakings which cross State lines' thus reflects a congressional judgment that certain activities of organized crime which were violative of state law had become a national problem." At p. 292, 89 S.Ct. at p. 538.

---

3. " * * * Dr. Kinzel would testify, if called, that the witness Thomas Rochford is today suffering from a serious mental illness known as schizophrenia; that he reached that conclusion based on the medical records submitted to us by the Government and marked as an exhibit which was prepared by Government doctors at Danbury and at the Federal hospital in Springfield, Missouri, a hospital for Federal prisoners, and Dr. Kinzel's interview with the witness, which lasted something in excess of an hour during the course of this trial, and his examination of the witness' prior testimony in June 1967, and his observation of the witness while he was briefly on the stand two days ago.

"I submit that the doctor would testify that the normal course of schizophrenia is a gradual development over a long period of time, and that it is his opinion, based on the records and the interview that he conducted that the witness has suffered from this mental disease in an ascending curve of severity from the early 1960's until today; that attributes of the disease from which the witness now suffers and from which he has suffered over a period

of several years are a susceptibility to suggestion, or a suggestibility, an inability to distinguish fact from fantasy, a susceptibility to partial amnesia, and a capacity to fill in the gaps in memory created by those partial amnesias with essentially fantasy recollections."

4. "You will recall that the witness, Mr. Rochford, took the stand briefly and began to testify in person. However, his testimony was interrupted and he did not testify in person. Instead his testimony of an earlier proceeding was read to you by Agent Brana.

"The Court had previously ruled that Mr. Rochford was competent to testify at an earlier proceeding, but it also ruled that Mr. Rochford is not competent to testify at this trial because he is presently suffering from a mental illness called schizophrenia.

"You are instructed that you are at liberty to consider his present mental illness of schizophrenia in determining whether or not to believe Mr. Rochford's testimony at the earlier proceeding which Agent Brana read to you."

As we have indicated the court struck down technical distinctions between blackmail and extortion concluding that the manner in which the State classifies its criminal prohibitions is of no consequence. Here North Carolina condemns blackmail declaring "* * * if any person shall accuse, or threaten to accuse * * * any other person of any crime punishable by law with death or by imprisonment in the state's prison, with intent to extort or gain from such person any * * * money * * * shall be guilty of a misdemeanor." Criminal Code 14–118 General Statutes of North Carolina (Vol. 1 B, Recompiled 1953). Further, where the offense is "done in secrecy and malice, or with deceit and attempt to defraud, the offender shall be * * * guilty of a felony and punished by imprisonment in the county jail or state prison for no less than four months nor more than ten years or shall be fined." Criminal Code § 14–3 General Statutes North Carolina. Had the attempt here been successful, North Carolina would have had jurisdiction under its blackmail statute. The accusation against Cohen, made in North Carolina, of an act of sodomy alleged to have occurred in New York, for the purpose of extorting money from him in North Carolina was punishable as a felony under the above law.[5]

Appellant's argument seems to be that since the alleged act of sodomy occurred in New York that it would not come within the blackmail statute of North Carolina. But such a construction would lead to absurd results. The State has as much interest in protecting its citizens from extortionate threats made in North Carolina but based on criminal acts occurring outside the State as it has in protecting the citizen from those threats based on criminal acts committed within its borders. Indeed, there is more danger in the former for the criminal act on which the threat is made being outside the State is more difficult of defense and is equally as destructive of the reputation of the victim. As we see it, the State has the duty to protect its people from both. Otherwise, the blackmailer in North Carolina need only base his threat on out-of-state criminal action and the State could not reach him. We cannot imagine any state intending such a result. Nor do we believe that North Carolina has provided such nonsense here. Its statute only requires that the extortionate threat be made in North Carolina and be of the commission of a crime "punishable by law * * * by imprisonment in the state's prison." This language includes the accusation of crimes committed in any State that are sufficiently serious to be punishable under the standards of North Carolina law by imprisonment in the State's prison.

As Chief Justice Warren emphasized in *Nardello*, the test of § 1952 is not the law of the State where the criminal act upon which the extortion is based occurred. It is the law where the extortion itself was undertaken.

### III.

We now reach the remaining questions raised by appellant.

1. Appellant claims the evidence is not sufficient in that its design was not to accuse Cohen of sodomy but merely to arrest him for it. This claim is frivolous. The service of the warrant and the exposure to arrest certainly included an accusation of the offense stated in the arrest warrant, i. e., "Sol. Imm. Purp.—Oral Copulation—Lewd and Lascivious Behavior" committed in the Borough of Manhattan. Furthermore, a spurious "confession" was also typed up and was among the papers to be used in the extortionate act and it specifically accused Cohen of the offense.

---

5. "Sec. 14–77 Crime against nature—If any person shall commit the crime against nature, with mankind or beast, he shall be guilty of a felony, and shall be fined or imprisoned in the discretion of the court." Gov't brief, p. 32.

2. The next question has to do with the use of Rochford's testimony at the first trial.

■■ Rochford was unavailable as a witness at the second trial because of his claimed lapse of memory. This circumstance is clearly within the exception long recognized that absence from the jurisdiction or death of a former witness permits the use of his testimony developed at a previous trial. Mattox v. United States, 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L. Ed.2d 255 (1968).

Nor do we find substance in the claim that Rochford was incompetent to testify at the time of the first trial. Neither the medical record nor Dr. Kinzel's testimony substantiates this claim. The trial judge was entirely justified in so finding.

■ 3. The credibility of Rochford's testimony at the first trial is quite a different matter. There is some force to the argument that where one side offers the former trial testimony of a witness now suffering from a mental illness alleged to have existed in some degree at the former trial, psychiatric testimony going to credibility should be allowed. Here Dr. Kinzel said that he had an "impression" that Rochford was suffering from schizophrenia between January 1966 and June 1967. The offer of proof was somewhat stronger indicating that Rochford had suffered from the disease in an ascending curve of severity since the early 1960's.

Still it does not follow that this ruling requires reversal. Dr. Kinzel only interviewed Rochford for about an hour; he refused to say that Rochford's testimony was incompetent at the first trial. On the other hand both the medical and lay testimony indicated Rochford was entirely competent. Dr. Ciccone had observed him day in and day out for several months after his sentence, and Mr. Isles had been with him in an intimate relationship for 13 months before Dr. Ciccone had seen him. Furthermore, the transcript of his first trial testimony indicated no attributes whatever of the disease. Moreover the jury knew of Rochford's mental condition and the trial judge instructed that they were at liberty to consider and reject his credibility if they so concluded. Finally, we have carefully studied the entire transcript of the trial and have concluded that Rochford's testimony was not essential to the Government's case. We, therefore, see no need for a third trial on this issue.

■ 4. Appellant claims that the use of his testimony given at the first trial violated the Fifth Amendment's Self-Incrimination Clause. We think not. The Supreme Court has held to the contrary. Harrison v. United States, 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L. Ed.2d 1047 (1968).

■ 5. The request for the grand jury minutes was first made on May 27, 1968. It is somewhat untimely. The appellant was indicted on May 16, 1967. At the first trial which was completed on July 11, 1967, no such claim was made. The second trial came on in September 1968. Moreover the original indictment here was returned prior to this court's admonition in United States v. Umans, 368 F.2d 725, 730 (2 Cir. 1966), cert. dismissed as improvidently granted, 389 U.S. 80, 88 S.Ct. 253, 19 L.Ed.2d 255 (1967), and it has repeatedly declined to dismiss such indictments in the absence of a showing of prejudice. We find prejudice conspicuously absent here where appellant had already had a full trial before a jury and thus knew all the testimony of the Government's witnesses. The fact that after Umans the Government obtained a superseding indictment to correct a clerical error does not dictate otherwise. Compare United States v. Bennett, 409 F.2d 888, 900 (2 Cir. 1968).

Affirmed.