# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

Nos. 06-2375, 06-2376 & 06-2421

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

RONALD MIKOS,

*Defendant-Appellant*.

———————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 CR 137—**Ronald A. Guzmán**, *Judge*.

———————

ARGUED AUGUST 16, 2007—DECIDED AUGUST 25, 2008

———————

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Medicare does not cover
the costs of routine medical procedures. Ronald Mikos, a
podiatrist, performed nothing but routine procedures,
such as trimming the toenails of people unable to clip
their own. Yet he billed Medicare for thousands of surger-
ies. When officials became suspicious, Mikos arranged for
some of his elderly patients (many of whom were not

mentally competent) to submit affidavits stating that surgeries had indeed occurred (though at trial Mikos's secretary of seven years testified that he had never performed a single surgery during her time in his employ, and medical specialists who examined these people found no signs of surgery). Other patients were less obliging, so Mikos wrote affidavits for them and had their signatures forged. A grand jury issued subpoenas to seven of Mikos's patients. He visited them, trying to dissuade each from testifying. None appeared to testify—whether because of Mikos's persuasiveness or because of their own mental and physical limitations, the record does not show. But we know why one of the seven did not show up. Joyce Brannon, who by then was cooperating with the investigators, had been shot six times at close range. After concluding that Mikos had slain her, the jury sentenced him to death. See 18 U.S.C. §1512(a)(1)(A). It also convicted him of other crimes, including fraud, obstruction of justice, attempting to influence a grand jury, and witness tampering. 18 U.S.C. §§ 1341, 1347, 1503, 1505, 1512(b)(1).

The evidence of fraud and witness tampering is overwhelming and essentially uncontested, though a dispute about the amount of loss requires some attention later. The evidence of murder also is strong.

Brannon had retired from her job as a nurse to become the secretary of a church, where she lived in the basement. The lack of shell casings led police to conclude that the killer had used a revolver. The bullets were .22 long rifle rim-fire, brass-coated rounds with solid round noses,

concave bases, and multiple knurled cannelures. Each bullet had been fired from a barrel with eight lands and grooves; the rifling had a right-hand twist.

Mikos owned a gun that could have fired those bullets. The police knew this because, three weeks before Brannon's murder, they had been called to the house of Shirley King, one of Mikos's girlfriends, and discovered that Mikos kept multiple firearms in King's residence. When Mikos could not produce a current firearm owner's identification card, the police took away the guns and ammunition, giving Mikos a detailed inventory. After renewing his card, Mikos retrieved the guns and transferred them to his storage unit at a stand-alone facility. After the murder, police searched the unit and found everything on the inventory, down to the last bullet—except for a .22 caliber Herbert Schmidt revolver that fired long rifle ammunition. A search of Mikos's car turned up a box of Remington .22 long rifle rim-fire, brass-coated rounds with solid round noses, concave bases, and multiple knurled cannelures. Twenty shells were missing from the box. The Schmidt revolver was never found. The car contained one spent casing with a mark made by a hemisphere-shaped firing pin. A Schmidt .22 revolver would have left such a mark (an unusual one).

One member of the church's staff saw Mikos (or someone who looked like him) at the church a week before Brannon's murder. The witness described the intruder's hair as gray, which Mikos's was not, but when searching his car the police found a bottle of gray hair coloring. That car also contained handwritten details of the church's

schedule—details that revealed when a person could enter Brannon's apartment without being seen. Data on his smart phone showed that he had been trying systematically to contact all of his patients who had been subpoenaed to provide records or testimony in the investigation. Records showed that he placed and received calls that went through cell towers near Brannon's church at approximately the time that he was identified as being there the week before the murder, and again one and two days before the murder. A jury could conclude that he had been watching to find the right opportunity to slip into Brannon's apartment. He had a motive to want Brannon silenced, and she (unlike many other patients) had resisted his efforts at persuasion. He owned a weapon that could have done the job, and the gun's disappearance is revealing. Motive, opportunity, and ability allowed a jury to find that Mikos killed Brannon to prevent her from testifying—and that is a capital crime.

## I

**1.** Federal agents entered Mikos's storage unit on the authority of a "sneak and peek" warrant. This kind of warrant permits inspection but not seizure. See 18 U.S.C. §3103a. Lack of seizure explains the "peek" part of the name; the "sneak" part comes from the fact that agents need not notify the owner until later. Such warrants are designed to permit an investigation without tipping off the suspect.

Agents who executed the sneak-and-peek warrant found so many firearms, and so much ammunition, that they

could not learn what was there without removing the guns and ammo from the storage unit and spreading them on the ground immediately outside the door, where they could be photographed. The agents also decided that there was no point in deferring the seizure, so one of their number was dispatched to obtain a regular warrant. It issued swiftly, and approximately four hours after arriving at the storage unit the agents executed the regular warrant and hauled away the guns and ammo. While waiting for that warrant, agents had tested several of the weapons to see whether they worked (they did).

Mikos contends that the evidence seized from the storage unit should have been suppressed, because by moving some of the guns outside and testing them the agents effected a "seizure" that the warrant did not authorize. We may assume that a seizure occurred, cf. *Bond v. United States*, 529 U.S. 334 (2000) (feeling an opaque bag to gain information about its contents); *Arizona v. Hicks*, 480 U.S. 321 (1987) (turning audio gear over to read its serial number), but use of the exclusionary rule would be unwarranted. First, the §3103a warrant authorized the agents to enter and inspect the storage locker, and by moving and testing the guns agents did not cause Mikos any distinct injury; second, a seizure was inevitable once the agents saw Mikos's arsenal. A premature seizure does not lead to exclusion of evidence when a warrant, authorizing everything that occurred, was certain to issue. See, e.g., *Nix v. Williams*, 467 U.S. 431 (1984); *United States v. Tejada*, 524 F.3d 809 (7th Cir. 2008). Cf. *Hudson v. Michigan*, 547 U.S. 586 (2006) (exclusion unjustified when the error is not in the causal chain leading to the evidence).

Here the steps to obtain a regular warrant were begun almost as soon as the agents saw the trove and were ongoing when the test-firings occurred; the fully authorized seizure took place within hours. Suppression of this evidence, seized with both probable cause and judicial authorization, would be a windfall that the fourth amendment does not command.

**2.** Mikos contends that the prosecutor violated the fifth amendment's self-incrimination clause by asking the jury to infer guilt from the fact that the Schmidt revolver was missing. He characterizes this line of argument as an impermissible comment on his failure to testify. See *Griffin v. California*, 380 U.S. 609 (1965). Whether Mikos testified was not relevant to the inference the prosecutor proposed, however; it would have been equally strong had Mikos tried to explain the gun's disappearance but left the jury unconvinced. It is entirely appropriate to draw an inference from the facts that (a) Mikos owned a particular weapon, (b) the weapon could have inflicted the fatal wounds, and (c) the weapon vanished at about the time of the murder, even though other weapons known to have been in the same place are accounted for. It is these facts, and not Mikos's decision to remain silent, that support an inference unfavorable to him. Nothing in *Griffin* or its successors prevents a prosecutor from urging the jury to draw inferences from events that can be established by evidence independent of the accused's silence. See *United States v. Robinson*, 485 U.S. 25 (1988); *United States v. Sblendorio*, 830 F.2d 1382, 1391–92 (7th Cir. 1987).

Mikos finds significance in the prosecutor's statements to the jury that "the only possible explanation for this gun being missing is because [Mikos] doesn't want it brought in here" and that Mikos was playing a "game of hide-and-go-seek". He characterized these statements as efforts to hold his silence against him. We read them, however, as efforts to hold his *conduct* against him. Hiding a gun is conduct, not (lack of) speech. Drawing inferences from the defendant's (mis)conduct is what a trial is all about.

**3.** The power of the inference from the gun's disappearance depended on proof that it could have fired the bullets that killed Brannon. Paul Tangren, an FBI agent who specializes in firearms' rifling and ballistics, testified as an expert that the gun's serial number revealed it to be a "Deputy Combo" model, and that a database of weapons maintained by the FBI shows that barrels of Herbert Schmidt Deputy Marshal models have eight grooves with a right-hand twist, matching the bullets that killed Brannon. Tangren also testified that the Deputy Combo and Deputy Marshal guns are physically identical; only the trade name differs. He retrieved a Herbert Schmidt Deputy Marshal revolver from the FBI's armory, fired it, and verified that the barrel had eight grooves and a right twist. Mikos insists that his gun was a "Model 21" rather than a "Deputy Combo" or "Deputy Marshal" and that the Herbert Schmidt Model 21 has only six grooves. Tangren testified, however, that the serial number could have been assigned only to a "Deputy Combo" model.

Mikos contends that the district judge should not have allowed the agent to deliver any of this testimony. The

agent was not qualified as an expert under Fed. R. Evid. 702, Mikos maintains, because there is no scholarly literature on the rifling of gun barrels, and the FBI's database is inaccurate (or at least incomplete). Publication is not a *sine qua non* of expert testimony, see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993), and whether the gun was a "Deputy Combo" or a "Model 21" is a factual question on which the district judge's findings must stand unless clearly erroneous, which they are not. (The jury had to decide in the end whether the missing gun was a model that would have produced bullets with eight grooves; we speak here only of the district court's preliminary findings that determine admissibility. See Fed. R. Evid. 104(a); *United States v. Martinez de Ortiz*, 907 F.2d 629 (7th Cir. 1990) (en banc).)

District judges may admit testimony resting on "scientific, technical or otherwise specialized knowledge" that will assist the trier of fact. Fed. R. Evid. 702. Testimony based on the FBI's rifling database may not have been "scientific", but it was both "technical" and "specialized". Rule 702 does not condition admissibility on the state of the published literature, or a complete and flaw-free set of data, but on these criteria:

> [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court concluded that these requirements had been satisfied—that the FBI's rifling data were "sufficient" and that the witness has applied "reliable . . . methods" in a reliable fashion. Appellate review is deferential, see *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and the district court did not abuse its discretion. Tangren not only looked up the content of the rifling database (learning that 16 models could have produced the sort of rifling observed on the bullets) but also tested the database's contents by firing a Herbert Schmidt Deputy Marshal revolver, which produced bullets with eight grooves and a right twist. The only purpose of the exercise was to learn whether Mikos's revolver could have been the murder weapon; the FBI agent candidly disclosed that at least 15 other models also could have fired those bullets. ("At least" because the database does not include every make and model of gun ever sold.) A database that does not include every weapon ever made can produce false negatives—that is, a gun that actually fired the bullets may have been omitted from the database—but not false positives, provided that the information about the guns actually tested has been recorded accurately.

Mikos contends that "the practice of matching spent bullets to a make and model gun" does not satisfy Rule 702, but the expert did not testify that bullets with such-and-such rifling must have come from a particular model of gun, let alone from a specific weapon. That would indeed overstate what is to be learned from the database. See Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmark Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005). Tangren's

testimony reliably applied the data for the purpose of saying that the rifling on the bullets did not *rule out* a Herbert Schmidt Deputy Combo revolver. That testimony, even with so limited a force, was relevant under Fed. R. Evid. 401 (Mikos likely would have been acquitted had the database shown that none of his guns could have been used to kill Brannon), and reliable given its limitations. The district court did not abuse its discretion in denying Mikos's request to exclude the evidence under Fed. R. Evid. 403 as unduly prejudicial. The jury was entitled to hear Tangren's evidence.

**4.** Having allowed Tangren to testify, Mikos insists, the judge should have granted his motion to hire ballistics expert David LaMagna at public expense. Both the Constitution, see *Ake v. Oklahoma*, 470 U.S. 68 (1985), and the Criminal Justice Act, see 18 U.S.C. §3006A(e)(1), entitle defendants to the services of experts necessary to meet the prosecution's case. The projected expense to retain LaMagna, at $250 an hour, would have exceeded the presumptive ceiling for an expert's services ($7,500, see 18 U.S.C. §3599(g)(2), since this is a capital case), and the district court told Mikos that he would approve another ballistics expert whose rates were lower, or whose travel time would have been less. (Experts bill for their travel; that's one reason why LaMagna's total fees would have exceeded the cap.) Mikos asked the court to let him hire John R. Nixon in lieu of LaMagna. The court gave its permission. Nixon examined the bullets and prepared a report—but the defense did not put Nixon on the stand or use his report as evidence. (It did proffer an unreasoned statement by Nixon that "there can be no

guaranty of consistency of land & groove measurements between crime laboratories" and that "suspect data [therefore] must have found its way into" the FBI's database, but these assertions did not respond to any issue in the case—and, given the absence of reasoning, the statement was not admissible.)

Mikos's appellate argument that the district judge should have let him hire LaMagna is a dud. Abstract propositions about entitlement to expert assistance go nowhere when the defendant *had* an expert. Mikos does not tell us what LaMagna could have done that Nixon was unable to do; for that matter, he does not tell us why he did not use Nixon as an expert. Nixon could have relied not only on his own work but also on LaMagna's published work, which critiques using ballistics data to make unique matches of bullets to guns (something that, to repeat, Tangren did not do). See Joan Griffin & David LaMagna, *Daubert Challenges to Forensic Evidence: Ballistics Next on the Firing Line*, 26 Champion 20 (Sept./Oct. 2002). Champion, a glossy publication for the defense bar, is not exactly a scholarly journal, and this short article was not refereed, but an expert still could have relied on it to the extent that it contained useful information about the FBI's rifling-characteristics database. See Fed. R. Evid. 703.

For all we know, Nixon ended up agreeing with Tangren, and perhaps LaMagna would have done so too. Neither the Constitution nor the Criminal Justice Act entitles a defendant to the best (or most expensive) expert, or to more than one expert if the first does not reach a conclusion favorable to the defense. Just as a defendant who

relies on counsel at public expense must accept a competent lawyer, rather than Clarence Darrow, see *Morris v. Slappy*, 461 U.S. 1 (1983), so a defendant who relies on public funds for expert assistance must be satisfied with a competent expert. Mikos does not argue that Nixon was incompetent (or even below average), so he has received his due.

**5.** Mikos wanted a jury-selection expert as well as a ballistics expert. The district judge turned him down flat on this second request, observing that the Criminal Justice Act and §3599 (21 U.S.C. §848(q) until its recodification in 2006) provide for experts on issues that affect guilt and sentencing. As far as we can tell, no district court (and certainly no court of appeals) has held that there is a statutory or constitutional entitlement to a jury-selection expert at public expense.

The Constitution entitles every defendant to a fair trial before an unbiased jury. The function of a jury-selection expert, however, is to bias the jury in his employer's favor. Whether this is a genuine field of expertise is open to doubt; some studies conclude that people who use jury-selection experts do no better (and may do worse) than those who do not. See Michael O. Finkelstein & Bruce Levin, *Clear Choices and Guesswork in Peremptory Challenges in Federal Criminal Trials*, 160 J. Royal Statistical Society A 275 (1997); Hans Zeisel & Shari Seidman Diamond, *The Effect of Peremptory Challenges on Jury and Verdict: An Experiment in a Federal District Court*, 30 Stan. L. Rev. 491 (1978). No matter. There is no right to an expert whose goal is to produce jurors who favor one side, and whose

leanings (doubtless slight, or they would not take expertise to ferret out) are undetectable to the other side, and thus will not lead to challenges for cause or peremptory strikes.

Perhaps one could put a better face on this and say that the goal of a jury-selection expert is to find and expose those subtle signs of bias in the venire that might elude counsel (and the district judge) unless detected in a scientific manner. If a prosecutor retains a jury-selection expert, a defendant might be able to show the need for one to level the playing field. But the prosecutor did not use a jury-selection expert in this case, and Mikos was not entitled to one. That could only lead to an arms race, and a race to introduce concealable biases into juries is not one that should be waged. See *Miller-El v. Dretke*, 545 U.S. 231, 266–73 (2005) (Breyer, J., concurring); *Batson v. Kentucky*, 476 U.S. 79, 102–03 (1986) (Marshall, J., concurring).

**6.** One final issue before we turn to the sentences. Mikos submits that the evidence was insufficient to support the jury's verdict that he murdered Brannon. No one saw him do it; the gun was not found; the killer left no fingerprints. And what was his motive?, counsel inquires. True, Mikos wanted to stay out of jail for Medicare fraud, but his lawyer observes that Mikos had submitted bogus claims on behalf of so many patients that he could not possibly have thought that he could silence them all. But he didn't need to. It would have been enough to silence the patients whose evidence or testimony had been sought. Mikos set out to do just that—by persuasion, by

submitting forged affidavits in the patients' names, and, the jury could conclude, by killing the one mentally competent patient who had made it clear that she would assist the prosecutors. Mikos may have been deluded (or desperate) in thinking that, if he could prevent an initial batch of patients from producing evidence of fraud, then the investigation would be called off—for, by the time the grand jury started issuing subpoenas, agents had inspected his books and concluded that *all* of his bills had been fabricated—but as long as Mikos thought that he could divert the investigators to easier targets he had a motive.

As for the lack of witnesses and fingerprints: The opening paragraphs of this opinion say all that is necessary. The evidence, though circumstantial, is damning. Alternative explanations, such as a burglary that went awry, are implausible; nothing was taken from (or even disturbed in) Brannon's apartment. Jurors learned that Mikos had been purchasing guns in quantity; agents found not only a storage unit full of weapons but also more guns in the ceiling tiles of his home, and still more hidden under his rafters. A sensible jury could find beyond a reasonable doubt that Mikos shot Brannon in cold blood, with premeditation, to prevent her from testifying against him.

## II

**1.** On the 24 non-capital convictions, Mikos received sentences of 60 months' imprisonment on each of 15 counts, and 78 months' imprisonment on each of the 9 remaining counts. All 24 sentences run concurrently and

include restitution of $1.8 million. Mikos contends that the district court overestimated the Medicare program's financial loss and as a result set the imprisonment and restitution too high.

During sentencing, Mikos's lawyer conceded that his total bills to the Medicare program were approximately $1.8 million. This led to a 16-level increase in his offense score under U.S.S.G. §2B1.1(b)(1)(I) (range from $1 million to $2.5 million). That concession is not dispositive, Mikos now contends, because Medicare might not have paid all of these claims, and some of them may have been legitimate. Whether Medicare paid is irrelevant to the loss calculation under §2B1.1, however, because that section deals with *intended* loss. Mikos billed the Medicare program for $1.8 million; that's the intended loss whether Medicare paid or not—unless some of the claims were legitimate. But the evidence shows that not one penny was payable. Mikos's appellate lawyer confuses legitimate *services* with legitimate *claims*. Mikos doubtless provided his patients with many services, such as removing ingrown toenails, but none of these routine services is covered by the Medicare program. He billed Medicare for podiatric surgery, and the record shows that he never performed any surgery. Thus all of the claims for payment from the Medicare program were illegitimate and the intended loss was $1.8 million.

Restitution is a different matter. It depends on actual rather than intended loss. See, e.g., *United States v. Webber*, No. 07-2117 (7th Cir. July 29, 2008), slip op. 30–38; *United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008); *United*

*States v. George*, 403 F.3d 470, 474 (7th Cir. 2005). It should have been a simple matter for the prosecution to show how much the Medicare program actually paid on Mikos's claims, but that evidence is not in the record. The burden of showing loss is on the prosecutor, so the award of restitution is vacated and must be recalculated on remand.

**2.** According to Mikos, the Federal Death Penalty Act, 18 U.S.C. §§ 3591–98, is unconstitutional because it violates the Indictment Clause of the fifth amendment (the Attorney General, not a grand jury, determines whether to seek capital punishment for a qualifying offense, and the statute does not require aggravating factors to be included in an indictment), because failure to apply the Federal Rules of Evidence and use of hearsay in sentencing violate the due process clause, and because the statutory aggravating factors are incomprehensible. These three arguments against the statute have been made in this circuit, and in others, to no avail.

The Indictment Clause argument has been made and rejected in *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) (en banc); and *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006). The argument about evidence has been made and rejected in many circuits. See, e.g., *United States v. Corley*, 519 F.3d 716, 723–27 (7th Cir. 2008); *United States v. Fulks*, 454 F.3d 410, 438 (4th Cir. 2006). The Supreme Court held in *Williams v. New York*, 337 U.S. 241 (1949), that the Constitution does not require application of the rules of evidence in capital sentencing, and in all the

ferment about capital punishment in the years since then the Court has never suggested any inclination to overrule *Williams*. See *Wiggins v. Smith*, 539 U.S. 510, 536–37 (2003). The vagueness argument has been made and rejected in *United States v. Webster*, 162 F.3d 308, 354 (5th Cir. 1998), among others. After *Jones v. United States*, 527 U.S. 373 (1999), rejected a functionally identical vagueness challenge, there is no room for maneuver. We rely on these decisions and see no constitutional reason why Mikos cannot be sentenced to death for his premeditated murder of a witness.

Only the indictment question calls for even brief comment. *Walton v. Arizona*, 497 U.S. 639 (1990), held that aggravating factors that make a person eligible for capital punishment are sentencing considerations that need not be alleged in an indictment. The Federal Death Penalty Act, enacted in 1994, assumed that *Walton* is correct and does not require aggravating factors to appear in the indictment. But in 2002 the Supreme Court overruled *Walton* and held that aggravating factors that make a crime death-eligible (though not those used in a later balancing procedure, see *United States v. Fell*, 2008 U.S. App. LEXIS 13831 at *105–11 (2d Cir. June 27, 2008) (collecting cases)) must be charged in the indictment. See *Ring v. Arizona*, 536 U.S. 584 (2002), a decision much influenced by *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The indictment of Mikos includes several aggravating factors. All requirements of *Ring* and *Apprendi* have been satisfied.

Nonetheless, Mikos insists that the statute must be declared unconstitutional because *it* does not demand

that the grand jury find the aggravating factors. He then contends that the statute is not severable, so that to find one constitutional flaw is to knock out the basis of all capital punishment. The argument goes wrong at the first step (and we need not decide whether the severability step is wrong as well), because *Ring* does not hold or imply that any part of the Federal Death Penalty Act is unconstitutional.

*Ring* does say that the Constitution demands that certain things be in an indictment if a capital sentence is to be valid, but the federal statute does not *forbid* aggravating factors in an indictment. It is silent on whether they are included. If the indictment complies with *Ring*, no constitutional error occurs. There is nothing to sever. As long as a defendant's rights under *Ring* are honored (as Mikos's were), it is a matter of indifference whether the rights were honored as a matter of statutory command or prosecutorial precaution. We have held much the same thing for 21 U.S.C. §841. Defendants argued after *Apprendi* that §841 is unconstitutional because it does not require drug quantities to be charged in indictments. We held, to the contrary, that §841 is silent on the subject, and that prosecutors are free to include all allegations needed to comply with *Apprendi*. Putting in the indictment more than the statutory floor does not imply that any law is unconstitutional. See *United States v. Brough*, 243 F.3d 1078 (7th Cir. 2001). Cf. *United States v. Cotton*, 535 U.S. 625 (2002).

Just so with the Federal Death Penalty Act. Title 18 says *what* must be proved, and sometimes it says how; other

sources, including the Constitution, the Federal Rules of Criminal Procedure, and the common law, add details about which tasks fall to prosecutors, judges, grand juries, and petit juries. That one source of law is silent on a procedural issue, such as what an indictment must contain, just leaves it to another source. Look at 18 U.S.C. §1347, the Medicare-fraud statute that Mikos has been convicted of violating. There is not a peep in §1347 (or almost any other statute) about what must be in an indictment, but no one would say that this makes the whole Criminal Code a rollicking violation of the Indictment Clause. Other sources of law supply details about what indictments (and other legal documents) contain, so that defendants' constitutional rights are fully respected.

**3.** The Federal Death Penalty Act provides that, if a defendant is convicted of a capital crime and the prosecutor requests the death penalty, a jury must decide at a sentencing proceeding whether the accused had the necessary mental state and at least one aggravating factor exists. If the jury unanimously answers both of these questions in the affirmative, see §3593(d), it must balance all considerations to determine whether capital punishment is appropriate. We call these "considerations" rather than "factors" because, although there is a statutory list of "factors" that a jury *must* consider (if raised by a party), there is no limit to the number of case-specific ("non-statutory") considerations that *may* influence a jury.

The two statutory aggravating factors were that Mikos substantially planned and premeditated the murder, §3592(c)(9), and that Brannon was "particularly vulnerable

due to . . . infirmity", §3592(c)(11). Brannon had retired from nursing because she had become so obese that she needed assistance to rise from a chair. (She had other conditions commonly associated with obesity.) She could not have run away or resisted an intruder. The jury found both of these aggravating factors unanimously and beyond a reasonable doubt. It also found three non-statutory aggravating considerations. One was that Mikos killed Brannon to prevent her from testifying against him. The second was that the crime caused loss to Brannon's friends, family, and co-workers. The third was that Mikos had not demonstrated remorse for his crimes. All of these were found unanimously, and beyond a reasonable doubt.

Mikos asked the jury to find 33 mitigating considerations. Several of these drew majority support. Eight members of the jury concluded, for example, that "Ronald Mikos has a loving relationship with his son, Ronald Mikos, Jr."; nine jurors concluded that Mikos's execution would cause his son "great pain and emotional distress." (A majority did not make similar findings for Mikos's other children.) A single juror concluded that Mikos's substance abuse had led to mental disorders that were mitigating (he submitted evidence that he began abusing prescription painkillers in the mid 1990s and began drinking heavily in 2001.) Two jurors concluded that the civil investigations into Mikos's fraud had caused him stress and led to drug and alcohol abuse, which was a mitigating consideration. Five jurors concluded that the delay in completing the civil investigation was a

mitigating consideration. But only four jurors supported the statement: "Ronald Mikos is a human being."

After making all of these findings, the jurors voted unanimously that Mikos be executed for killing Joyce Brannon.

Mikos contests two of the five aggravating factors or considerations: vulnerable victim and lack of remorse. We begin with the first of these, because it is one of the two statutory aggravating factors that the jury found. (The non-statutory aggravating circumstances are less important.) The prosecutor contends that some of Mikos's arguments on sentencing have been forfeited because counsel did not make the appropriate objection at the appropriate time, but we consider all of the appellate arguments on the merits lest we see them again in the guise of a contention that Mikos received ineffective assistance of counsel, despite the diligent work done on his behalf.

**a.** Mikos might perhaps have argued that six well-placed bullets will kill anyone, so vulnerability cannot be in issue, but he does not take that line. Brannon was vulnerable, not because she was especially susceptible to bullets, but because she was immobile and could neither run nor fight back when an intruder broke into her apartment. Nor could she seek help in whatever period of consciousness remained to her after the intruder had emptied his gun into her back and neck, piercing her lungs and severing her carotid artery. Both *United States v. Sampson*, 486 F.3d 13, 48–49 (1st Cir. 2007), and *United States v. Paul*, 217 F.3d 989, 1001–02 (8th Cir. 2000), hold that disabilities making it hard for the victim to resist or flee support a vulnerable-victim finding under §3592(c)(11).

Our dissenting colleague asserts that Brannon's disabilities are irrelevant because "[s]he could not have outrun [Mikos's] bullets even if she had been an Olympic sprinter" (dissent at 31) and that her doom was sealed once "he was standing behind her" (*id*. at 30). Mikos himself does not contend this—not in the district court, and not in this court. Our colleague's position ignores everything that occurred before Mikos was standing inches from Brannon with a loaded revolver. If Mikos had killed Brannon with a sniper rifle from across the street, and the first sign of the attack had been a bullet in her head, then her disability would indeed be immaterial. But Mikos instead entered her apartment and walked up to her chair. She was powerless to escape, because she was unable to rise. Even a trained user of handguns has trouble hitting a moving target, so had Brannon been able to run out of her apartment as Mikos entered, she might be alive today. But she could not rise; her physical condition made her a sitting duck. That's why Mikos has never ventured the argument that our dissenting colleague advances. The standards of plain error, see *United States v. Olano*, 507 U.S. 725, 733–37 (1993), have not been satisfied. Whether Brannon's obesity contributed to her demise is a factual question, not a legal question for appellate judges, and the evidence permitted a rational jury to find as this jury did.

Instead of opposing the vulnerable-victim factor altogether, Mikos contends that the prosecutor overstepped in one part of his argument to the jury. A medical examiner testified that Brannon bled to death (both internal hemorrhaging and loss from the severed artery) over the course

of three or four minutes. In closing argument the prosecu-
tor asked the rhetorical question "What was [Brannon]
thinking when she sat there for three to four minutes
dying? . . . What was she thinking? She couldn't move, she
couldn't cry out, she couldn't run, and the reason she
couldn't do those things was due to her disability." This
was a plea for sympathy, an appeal to emotions rather
than reason, Mikos maintains. Perhaps Brannon fell
quickly into unconsciousness, but, even if she did not, the
argument goes, a prosecutor should stick to the facts
rather than speculate about a victim's mental processes.

"What was she thinking?" is indeed a bad question to
have asked, even rhetorically, for the reasons Mikos has
articulated. But it is impossible to believe that this brief
foray could have affected the jury's verdict. Missteps
during closing argument are common, because these
arguments are unscripted. They justify a new trial only
when they are likely to overwhelm other, appropriate,
considerations. See *Darden v. Wainwright*, 477 U.S. 168,
179–83 (1986). Here the jury's attention was focused by
judge and counsel alike on the right question: whether
Brannon's obesity hindered her ability to resist or flee.
The jury's verdict is reliable.

**b.** Mikos challenges the lack-of-remorse consideration
on two fronts. He contends that prosecutorial statements
about Mikos's remorse-free demeanor *in court* amount
to a penalty for his failure to testify. And he maintains
that the evidence did not support this factor. Relying on
*United States v. Roman*, 371 F. Supp. 2d 36 (D. P.R. 2005), he
argues that only gloating or boastfulness, after the fashion

of Leopold and Loeb, show a meaningful "lack of re-morse."

There is a sense in which "lack of remorse" overlaps with "the defendant did not plead guilty", but the Supreme Court has approved this factor, see *Zant v. Stephens*, 462 U.S. 862, 886 n.22 (1983), which differs in principle from a penalty for failure to incriminate oneself. It is common, and acceptable, to give lower sentences to persons who confess and show remorse than to persons who do not; the Sentencing Guidelines institutionalize this with a two-level or three-level reduction for acceptance of responsibility. U.S.S.G. §3E1.1. Mikos fought every charge every step of the way. That was his right, but in the process he showed no remorse, compared with a person who conceded some culpability (if only on the fraud charges, which were indisputable). If it is proper to take confessions, guilty pleas, and vows to improve one's life into account when deciding whether a murderer should be put to death—and it is unquestionably proper for a judge or jury to do so, see *Williams v. Taylor*, 529 U.S. 362, 398 (2000)—then it must also be proper for the prosecutor to remind the jury when none of these events has occurred. The consequence of no remorse is built into the Guidelines, see *United States v. Klotz*, 943 F.2d 707 (7th Cir. 1991); in a capital case, by contrast, nothing is built in, so what happens automatically as a result of §3E1.1 must be argued for. The two are equally appropriate.

The prosecutor's main theme was not the absence of a guilty plea, or Mikos's silence (= the lack of an apology) in open court, but the fact that Mikos had not done any-

thing to reduce or redress the hurt his crimes had caused. He had not, for example, covered the costs of Brannon's burial, leaving these to her family and her church. Instead of taking steps to make good the losses for which he was responsible, Mikos has used his free time in jail to try to swindle the Medicare fund out of more money. He sent off documents asking that payment be made to a differently named entity at a different address, hoping that this would evade administrative orders forbidding payment to the name of his medical practice on file with the bureaucracy. He continued contacting prospective witnesses and attempting to persuade them to keep silent or to tell lies on his behalf. Someone who carries on with crime, even after being caught and imprisoned, can be called remorseless without stretching the term. He is both more dangerous and less capable of incapacitation by imprisonment than is someone who genuinely regrets his misdeeds.

Remorse means regret and contrition. *Roman* surely is right to say that bragging about one's criminal escapades shows lack of remorse, but it is mistaken to say that this is the *only* way to show the absence of remorse. Letting victims bear the loss of crime, while trying to tamper with witnesses to escape conviction and commit more wrongs, also signal lack of remorse, and that demonstration was made here. The jury convicted Mikos of obstructing justice, not just of fraud and murder.

But let us suppose that this is wrong and that lack of remorse has not been made out as a valid non-statutory aggravating consideration. Lack of remorse is a non-

statutory consideration; it did not play a role in making Mikos eligible for the death penalty. The Supreme Court held in *Brown v. Sanders*, 546 U.S. 212 (2006), that when an aggravating consideration other than one essential to death-eligibility is set aside, the sentence still may be affirmed if all of the evidence that supported this consideration would have been admitted anyway, or if the court conducts an independent review and concludes that the verdict remains appropriate without the invalid consideration. *Brown* arose on collateral review of a state court's judgment, but most of what *Brown* says concerns how an appellate court should proceed on direct review of a death sentence and hence is equally applicable within the federal system. The Court's opinion in *Jones*, 527 U.S. at 402–05, arises from direct review of a federal death sentence and reaches a similar conclusion, holding that a federal court of appeals may declare an error concerning an aggravating consideration harmless if the judges are convinced that the jury would have returned the same verdict had the invalid aggravating consideration not been submitted at trial.

Mikos does not contend that the "lack of remorse" consideration put before the jury any evidence that it ought not have received. Most of Mikos's contentions address the prosecutor's closing argument, which came after all of the evidence. The jury was entitled to learn about Mikos's efforts to continue collecting from Medicare (that was relevant to the substantive charges, and the evidence came in during the trial on the merits) and his efforts to influence witnesses from prison (ditto: this was relevant to several of the substantive counts). Mikos's

demeanor in court—whether he was stony-faced or teary-eyed—was already known to the jurors.

So all we have is the prosecutor's argument about lack of remorse. Take away those few pages of transcript, and the weight of evidence remains. Four aggravating factors or considerations are solid. The facts of this cold-blooded execution of a potential witness dominate. Prosecutorial comments about Mikos's demeanor in court and lack of visible remorse strike us, and likely struck the jurors, as gilding the lily. Many a problem in a criminal prosecution is caused by such rhetorical excesses. Prosecutors cannot know what will carry weight with jurors, so they are tempted to try every avenue. When they do, that opens the door to claims of error and appellate second-guessing. That's why the doctrine of harmless error is essential. If error occurred in this penalty proceeding, it was harmless.

AFFIRMED ON ALL SUBJECTS EXCEPT RESTITUTION,
WHICH IS REMANDED.

POSNER, *Circuit Judge*, concurring in part and dissenting in part. I agree that the defendant's conviction should be upheld and I join that part of the majority opinion. But he is entitled to a new death-penalty hearing. The prosecutor was not content to point out that the murder was the result of "substantial planning and premeditation to

cause the death of a person or commit an act of terrorism," which the Federal Death Penalty Act explicitly allows the jury to deem a factor entitling it to impose the death penalty. 18 U.S.C. § 3592(c)(9). He also argued that the victim "was particularly vulnerable due to old age, youth, or infirmity," another explicit statutory factor, § 3592(c)(11), and that (under the radically unspecific statutory catch-all—"any other aggravating factor [that is, any other factor, besides those specified in the statute, that a jury can treat as a reason for sentencing the defendant to death] for which notice has been given," § 3592(c) following (16)) the defendant had shown a lack of remorse for the murder. The prosecutor advanced two other nonstatutory factors as well: that the defendant had killed his victim to prevent her from testifying against him, and that the murder had caused emotional harm to the victim's family and friends; but these add little to the fact that the victim was killed and the murder planned.

The prosecutor's arguments based on victim vulnerability and the defendant's lack of remorse were unsound, and I do not think it is possible to find beyond a reasonable doubt (the applicable standard, 18 U.S.C. § 3595(c)(2)) that the jury would have sentenced the defendant to death even if those arguments had not been made. There is much fussing in the briefs over the defendant's failure to object to the arguments, but that misses the point. Even if there was nothing wrong with the prosecutor's making the arguments, they don't provide a basis for a finding beyond a reasonable doubt that the victim was vulnerable or that the defendant lacked remorse.

Vulnerability is relative to the nature of the crime. *United States v. Sampson*, 486 F.3d 13, 48-49 (1st Cir. 2007). A closeted homosexual is particularly vulnerable to being blackmailed, *United States v. Lallemand*, 989 F.2d 936, 939 (7th Cir. 1993); *United States v. Hughes*, 411 F.2d 461, 462-63 (2d Cir. 1969), but he is not particularly vulnerable to credit-card fraud. The fact that the victim in this case was a 5-foot 3-inch woman who weighed nearly 300 pounds might have made her particularly vulnerable to solicitations for fraudulent weight-loss programs, to mugging, and to a variety of other crimes, but not to being shot to death in her apartment. In *Sampson*, the victim was fleeing from a knife-wielding assailant and might have escaped had it not been that he had "undergone open-heart surgery (a quintuple bypass) approximately one year prior to his encounter with Sampson; that he was overweight and became short of breath easily; and that he had difficulty walking fifteen feet shortly before his murder." 486 F.3d at 49. In *United States v. Paul*, 217 F.3d 989, 1001-02 (8th Cir. 2000), the victim was 83 years old and the court thought he might have escaped or beaten off his attackers had he been younger. This case, in contrast, is like *United States v. Johnson*, 136 F. Supp. 2d 553, 560 (W.D. Va. 2001), where "the victim was killed instantaneously when the explosive device detonated. Nothing about [her] physical condition weakened her capacity to resist the fatal blast." See also *Francis v. State*, 808 So. 2d 110, 139 (Fla. 2001).

It is true that the younger and stronger the intended victim of a shooting, the more likely he is to be able to resist effectively or survive his wounds. But if this argument is pressed hard enough, everyone over 50 would

be deemed a vulnerable victim in any case involving the use of force. Vulnerability must be assessed on the basis of the relation of the victim's condition to the particular circumstances of the crime, *Jones v. United States*, 527 U.S. 373, 401-02 (1999), as in *United States v. Johnson*, *supra*.

So although the judge properly instructed the jury that the government had to prove beyond a reasonable doubt that "any infirmity which you find made [the victim] particularly vulnerable must somehow have contributed to her death," see *United States v. Sampson*, *supra*, 486 F.3d at 34, missing from this case is evidence that the victim's vulnerability did contribute to her death—evidence that a healthier victim might have survived being shot six times in the back at point-blank range or that the defendant would not have tried to kill her had she been healthier because he would have been afraid that she would grab the gun from him. The government lawyer did speculate at the argument in this court that had the victim been of normal weight she might have grabbed the gun from the defendant's grasp, but that is fanciful in the extreme, especially as he was standing behind her.

I do not mean to understate the victim's disability caused by her obesity. She had difficulty getting up from a sitting position and needed canes for walking, and she used a catheter because she had trouble getting to the bathroom in time when she had to urinate. She had rolls of abdominal fat hanging down so low that they were at the level of her knees, and the fat had become infected and had required surgery to save her life from an infection. She

had asthma and arthritis and leg cramps and for the accumulation of her ailments took about 15 medications, some of which caused drowsiness and fatigue. Although neither singly nor in combination did her ailments have anything to do with her vulnerability to being shot fatally from behind at close range, the category of nonstatutory aggravating factors is open-ended and the prosecutor could have argued that to kill a person already so afflicted was especially cruel and ugly, like the "brutal and senseless execution style murder of a helpless child" in *Black v. Bell*, 181 F. Supp. 2d 832, 863 (M.D. Tenn. 2001). There are intimations of such an argument in the prosecutor's closing statement to the jury, but he did not ask the jury to consider this as a factor in aggravation of the defendant's conduct; he relied instead on the statutory factor of vulnerable victim, and that was a mistake; the average person would not have escaped in this case with his life. Having studied the church's schedule, the defendant was able to sneak in when he knew that the victim would be alone. Once he was inside the church with a gun and determined to kill her, her death was inevitable, no matter what her physical condition. She could not have outrun his bullets even if she had been an Olympic sprinter.

The aggravating factor to which the prosecutor devoted the bulk of his closing argument was lack of remorse. He pointed out that after killing his victim the defendant had continued to engage in the Medicare fraud that had motivated the murder. To deem that a circumstance in aggravation was double counting. The murder was a result of substantial planning and premeditation because it was a means of trying to defeat the fraud prosecution and

enable the defendant to continue engaging in fraud. The planning was an aggravating factor that entitled the jury in the exercise of its discretion to sentence him to death, but it was not evidence of a lack of remorse distinct from any inference of remorselessness that one would draw from any murder that had been planned rather than being spontaneous.

The prosecutor told the jury that the defendant is "sitting 20 feet away from you and there's nothing, no remorse whatsoever, because he thinks he got away with it." (An echo of Camus: "And has he uttered a word of regret for his most odious crime? Not one word, gentlemen. Not once in the course of these proceedings did this man show the least contrition." Albert Camus, *The Stranger* 126 (1954 [1944]).) Later the prosecutor added that the defendant is "sorry he got caught, but he's not sorry that he shot [the victim]. The only ramification of that as he's sitting opposite you right now, nothing else in this man's heart, not a single thing. He has no remorse for what he did." The only inference the jury could have drawn (for it was given no guidance by the judge, who said about remorse only that the government alleged "that defendant has demonstrated a lack of remorse for his criminal conduct"—which might have been taken to mean that it could impose the death penalty because of the defendant's lack of remorse for committing Medicare fraud) was that his failure to confess to the murder in open court showed that he lacked remorse. Had he confessed, however, the jury might still have imposed the death penalty and he would have given away his colorable (though ultimately unsuc-

cessful) claim that the government had failed to prove his guilt beyond a reasonable doubt.

It is true that something like this Hobson's Choice is built into the federal sentencing guidelines for noncapital federal crimes. Ordinarily, to obtain a sentencing discount for accepting responsibility for the crime with which one is charged one has to plead guilty and thus give up the chance to contest guilt. U.S. Sentencing Guidelines § 3E1.1, Application Notes 2, 3; *United States v. Guadagno*, 970 F.2d 214, 226 (7th Cir. 1992); *United States v. Escobar-Mejia*, 915 F.2d 1152, 1153 (7th Cir. 1990); *United States v. Williams*, 940 F.2d 176, 183 (6th Cir. 1991). But there is a difference between a defendant's arguing for leniency on the basis of his admitting to having committed the crime with which he is charged and the government's asking the jury to draw an inference of heinousness from his failure to admit that. *United States v. Saunders*, 973 F.2d 1354, 1362-63 (7th Cir. 1992). In the first case the government is giving (or, *Booker* having demoted the sentencing guidelines to advisory status, recommending that the judge give) the defendant a break in exchange for his sparing the government the expense and uncertainty of a trial. In the second case the judge is asking the jury to infer remorselessness from the defendant's refusal to acknowledge guilt. Yet the motive for that refusal is likely to be simply that the defendant thinks he might be acquitted. You can feel remorse for having committed a crime without wanting to be punished by life in prison or death. A defendant who accepts responsibility for his crime is not denied a sentencing discount for that acceptance on the theory that if he were really

contrite he wouldn't be seeking a lighter sentence—he would reject the acceptance discount.

One could imagine a legislature's dissolving the difference between a punishment increase for proving lack of remorse and the denial of a punishment decrease for failing to prove remorse by deeming failure to prove remorse (a mitigating factor) proof of lack of remorse (an aggravating factor). But Congress has not done that. The Federal Death Penalty Act requires proof of an aggravating factor beyond a reasonable doubt, but proof of a mitigating factor by a mere preponderance of the evidence. As the Supreme Court explained in *McMillan v. Pennsylvania*, 477 U.S. 79, 100-01 (1986) (citations omitted), "the distinction between aggravating and mitigating facts has been criticized as formalistic. But its ability to identify genuine constitutional threats depends on nothing more than the continued functioning of the democratic process. To appreciate the difference between aggravating and mitigating circumstances, it is important to remember that although States may reach the same destination either by criminalizing conduct and allowing an affirmative defense, or by prohibiting lesser conduct and enhancing the penalty, legislation proceeding along these two paths is very different even if it might theoretically achieve the same result. Consider, for example, a statute making presence 'in any private or public place' a 'felony punishable by up to five years imprisonment' and yet allowing 'an affirmative defense for the defendant to prove, to a preponderance of the evidence, that he was not robbing a bank.' No democratically elected legislature would enact such a law."

What would demonstrate a lack of remorse would be statements (such as bragging about the murder), gestures, laughter as the murder was described or a grieving relative testified, or facial expressions that indicated that the defendant had indeed no regret about having committed the murder. And thus in *Emmett v. Kelly*, 474 F.3d 154, 170 (4th Cir. 2007), "when questioned about the circumstances leading up to the murder, Emmett told the police that [his victim] was 'an asshole' who 'wouldn't loan me no money,' and that it 'just seemed right at the time,' demonstrating a lack of remorse and callous disregard for human life similar to that demonstrated in the wake of his killing of the motorcyclist a few years prior." See also *Thomas v. Gilmore,* 144 F.3d 513, 514 (7th Cir. 1998); *Coble v. Quartermanm* 496 F.3d 430, 438 (5th Cir. 2007); *United States v. Roman*, 371 F. Supp. 2d 36, 48, 50-51 (D.P.R. 2005).

Mere silence is not enough to demonstrate lack of remorse. Nor failure to take extraordinary efforts to demonstrate remorse, such as paying for the victim's funeral expenses. Such a failure might defeat the defendant's effort to plead remorse as a mitigating factor; but the absence of a mitigating factor cannot automatically be converted to the presence of an aggravating one.

Psychologists who set out to study lack of remorse among prisoners proceeded as follows: "Lack of remorse was operationalized as either (a) a negative answer to a question concerning whether the respondent ever regretted having destroyed or stolen property, or mistreated or harmed another person, or wished these major

violations of the rights of others had never happened; or (b) an affirmative answer to a question concerning whether the respondent felt he or she had the right to do the behavior(s), or that the people affected by the behavior(s) deserved what they got." Risë B. Goldstein, et al., "Lack of Remorse in Antisocial Personality Disorder: Sociodemographic Correlates, Symptomatic Presentation, and Comorbidity With Axis I and Axis II Disorders in the National Epidemiologic Survey on Alcohol and Related Conditions," 47 *Comprehensive Psychiatry* 289, 291 (2006); see also Martha Grace Duncan, "'So Young and So Untender': Remorseless Children and the Expectations of the Law," 102 *Colum. L. Rev.* 1469, 1491-92 (2002). No effort to do that was made in this case. It would have helped had the prosecutor or the judge (or for that matter the defendant's lawyer) told the jury what "remorse" means and how its presence or absence can be determined. They did not.

Not every premeditated murderer is sentenced to death, see, e.g., *Carmichael v. State*, 12 S.W.3d 225 (Ark. 2000); *Schoels v. State*, 966 P.2d 735 (Nev. 1998); *People v. Poindexter*, 50 Cal. Rptr. 3d 489 (App. 2006)—quite the contrary. The force of 18 U.S.C. § 3592(c)(9) is not in the word "premeditation" but in the phrase "substantial planning"—yet not all murderers who plan their murders well in advance are sentenced to death either. See, e.g., *United States v. Russell*, 971 F.2d 1098, 1103-04 (4th Cir. 1992); *People v. St. Joseph*, 276 Cal. Rptr. 498, 500-01 (App. 1990). Without the aggravating factors found by the jury in this case, it is uncertain whether the defendant would have been sentenced to death. In one study, 39.8

percent of jurors in capital cases said that a lack of remorse either made them or would have made them more likely to vote to impose the death penalty. Stephen P. Garvey, "Aggravation and Mitigation in Capital Cases: What Do Jurors Think?," 98 *Colum. L. Rev.* 1538, 1560-61 (1998). A study by Theodore Eisenberg *et al.*, "But Was He Sorry? The Role of Remorse in Capital Sentencing," 83 *Cornell L. Rev.* 1599, 1633 (1998), found that lack of remorse was the third most powerful aggravating factor in capital sentencing. See also Scott E. Sundby, "The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty," 83 *Cornell L. Rev.* 1557, 1560 (1998); William S. Geimer & Jonathan Amsterdam, "Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases," 15 *Am. J. Crim. L.* 1, 40-41 (l987-1988). "In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies." *Riggins v. Nevada*, 504 U.S. 127, 144 (1992) (concurring opinion).